IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KRISTIN DENALFO, as Personal Representative of The Estate of NICHOLAS MARKS,

Plaintiff,

v.

ROCKHILL MANAGEMENT COMPANY, LLC, ROCKPOINT GROUP, LLC, and 100 SUMMER OWNER LLC,

Defendants,

ROCKHILL MANAGEMENT, L.L.C., ROCKPOINT GROUP, L.L.C., and 100 SUMMER OWNER LLC,

Third-Party Plaintiffs,

v

SKY SAFETY, INC., AMERICAN ANCHOR, INC., and WISS, JANEY, ELSTNER ASSOCIATES, INC.,

Third-Party Defendants.

C.A. No. 1:25-cv-12907-MJJ

**DEFENDANTS' THIRD-PARTY COMPLAINT AGAINST SKY SAFETY, INC., AMERICAN ANCHOR, INC., AND WISS, JANEY, ELSTNER ASSOCIATES, INC.**

Pursuant to Fed. R. Civ. P. 14, the defendants, Rockhill Management, L.L.C., misnamed, Rockpoint Group, L.L.C., misnamed, and 100 Summer Owner LLC, (collectively "defendants/third-party plaintiffs"), hereby submit the Third-Party Complaint herein against third-party defendants, Sky Safety, Inc., American Anchor, Inc., and Wiss, Janey, Elstner Associates, Inc. as follows:

## PARTIES

1. Upon information and belief, the primary plaintiff, Kristin Denaflo, is the Personal Representative of the Estate of Nicholas J. Marks, and is a resident of Weymouth, Massachusetts.

2. The defendant, Rockhill Management, L.L.C., misnamed (or “Rockhill”), is a limited liability company organized under the laws of Delaware with a principal place of business in Dallas, Texas.

3. The defendant, Rockpoint Group, L.L.C., misnamed (or “Rockpoint”), is a limited liability company organized under the laws of Delaware with a principal place of business in Dallas, Texas.

4. The defendant, 100 Summer Owner LLC, (or “100 Summer Owner”), is a limited liability company organized under the laws of Delaware with a principal place of business in Dallas, Texas.

5. The proposed third-party defendant, Sky Safety, Inc., (or “Sky Safety”), is a corporation organized under the laws of Massachusetts with a principal place of business in East Boston, Massachusetts.

6. The proposed third-party defendant, American Anchor, Inc., (or “American Anchor”), is a corporation organized under the laws of Massachusetts with a principal place of business in Taunton, Massachusetts.

7. The proposed third-party defendant, Wiss, Janey, Elstner Associates, Inc., (or “WJE”), is a corporation organized under the laws of Illinois with a principal place of business in Northbrook, Illinois.

## JURISDICTION

8. This Court has supplemental jurisdiction over this Third-Party Complaint pursuant to 28 U.S.C. § 1367 because the claims set forth herein are so related to the claims set forth in the primary plaintiff’s Complaint, over which the Court has original jurisdiction, that they form part of the same case and controversy.

## BACKGROUND

### I. THE PLAINTIFF’S COMPLAINT

9. The primary plaintiff has filed a wrongful death claim against the defendants/third-party plaintiffs alleging that the defendants/third-party plaintiffs’ negligence and/or gross negligence caused the death of the decedent, Nicholas Marks, on October 23, 2023.

10. The primary plaintiff alleges that the defendants/third-party plaintiffs owned, operated and/or maintained the high-rise commercial building located at 100 Summer Street, Boston, Massachusetts (“subject building”).

11. The primary plaintiff alleges that on October 23, 2023, the decedent, Nicholas Marks, was acting in the course and scope of his employment with Sky Safety preparing to perform window washing services at the subject building.

12. The primary plaintiff alleges that the subject building is a commercial high-rise building standing approximately 450 feet tall, consisting of 32 floors, and originally constructed in 1974.

13. The primary plaintiff alleges that on October 23, 2023, the decedent was a highly experienced and skilled window washer working under the direction of his employer, Sky Safety.

14. The primary plaintiff alleges that, at the time, Sky Safety, had been contracted by the defendants/third-party plaintiffs to perform exterior window cleaning services on the facade of the subject building.

15. The primary plaintiff alleges that, in 2022, the defendants/third-party plaintiffs undertook renovations of the roof deck at the subject building and further alleges that despite the renovations, no corresponding repairs or replacements were made to the rubber membrane covering the metal flashing at the edge of the parapet wall.

16. The primary plaintiff alleges that, in 2022, the defendants/third-party plaintiffs engaged American Anchor to perform a full proof load test of the rooftop anchor systems at the subject building.

17. The primary plaintiff alleges that during the testing, American Anchor identified that certain rooftop anchors were "flexing and causing damage to the flashing." The primary plaintiff also alleges that testing was halted to avoid further compromising the building's waterproofing integrity.

18. The primary plaintiff alleges that in the early morning hours of October 23, 2023, the decedent accessed the roof of the subject building to begin preparations for exterior window washing using a rope descent system ("RDS"), which included a bosun's chair, which is a suspended seat commonly used for tasks requiring elevation access.

19. The primary plaintiff alleges that while attempting to enter the bosun's chair and begin his descent, the primary working line of the RDS was severed at the edge of the parapet wall, causing the decedent to fall from the rooftop and plummet to the ground, suffering fatal injuries.

20. The primary plaintiff alleges that defendants/third-party plaintiffs knew or should have known that the rooftop safety infrastructure, including the rubber flashing and anchor systems, posed a significant hazard.

21. The primary plaintiff alleges that the defendants/third-party plaintiffs failed to take any corrective action which led to severing of the rope that allegedly resulted in decedent's death.

## II. THE CONTRACT WITH WJE

22. Prior to the decedent's alleged accident, on July 29, 2021, 100 Summer Owner entered into a Professional Services Agreement with third-party defendant, WJE, under which WJE was

contracted to provide facade inspection and assessment services, conduct cleaning trials and develop cleaning recommendations at the subject building. *See* Professional Services Agreement and Proposal (attached hereto as **Exhibit A)**.

23. Pursuant to the Professional Services Agreement, and the Proposal, which was incorporated into the executed Professional Services Agreement, WJE agreed to provide cleaning trials, provide related reports and recommendations, and construction period services which consisted of WJE conducting site visits to monitor the facade cleaning process during the repair phase and notify Rockhill of any problematic conditions observed. **Exhibit A** at 17-19. In addition, WJE was contracted to visually inspect all exterior walls and appurtenances at the subject building, notify the defendants/third-party plaintiffs of any unsafe conditions observed during the inspection, and prepare and submit the Facade Ordinance Inspection Report to the City of Boston. *Id*., at 8.

24. The Professional Services Agreement contains an indemnification provision under which WJE was, and remains, required to, "indemnify, protect, defend and hold harmless [100 Summer Owner LLC] and its partners, members, subsidiaries and affiliated companies, and all of their respective employees, partners, members, stockholders, officers, directors, agents, lenders, successors and assigns…from any and all expenses, costs (including, without limitation, attorneys' fees and witness fees), losses, claims, demands, causes of action, damages, judgments, judgment liens, encumbrances, orders, awards, penalties or other liabilities…which arise from or relate to the negligent acts, errors and/or omissions of [WJE], or its agents, employees, anyone employed directly or indirectly by any of them or for whose acts they may be liable or any or all of them in connection with the performance of the Services." *See* **Exhibit A** at 5 § 8.

25. Under the Professional Services Agreement, WJE was required to purchase and maintain a policy of commercial general liability insurance, and name 100 Summer Owner, (and its partners, members, subsidiaries and affiliated companies, and all of their respective employees, partners, members, stockholders, officers, directors, agents, lenders, successors and assigns), and any lender identified by 100 Summer Owner as additional insureds with respect to liability arising out of or resulting from the performance of the services under the Professional Services Agreement. *See* **Exhibit A** at 10.

26. Rockhill is an agent of 100 Summer Owner and Rockpoint is an affiliate of 100 Summer Owner, which are entitled to WJE's defense and indemnification to the same extent as 100 Summer Owner, under both the insurance and indemnification provisions of the Professional Services Agreement(s).

27. The decedent's alleged fall and death on October 23, 2023, was the direct result of WJE's acts, omissions, negligence, gross negligence, and/or conduct in the performance of its services under the Professional Services Agreement, including its negligent inspection, failure to warn, and/or its failure to provide services in accordance with the standard of care required of the average qualified professional practicing in WJE' s practice and/or specialty and/or its failure to exercise the degree of care and skill exercised by qualified and experienced members of WJE's profession practicing under similar conditions in the same locality and in connection with projects of similar complexity, magnitude, and/or quality.

## III. THE CONTRACT WITH SKY SAFETY

28. From January 1, 2023 through the date of its termination on December 3, 2023, third-party defendant, Sky Safety, was contracted by 100 Summer Owner, to provide exterior window cleaning at the subject building. *See* Sky Safety Agreement (attached hereto as **Exhibit B**).

29. Pursuant to this agreement, Sky Safety was, and is, required to "indemnify, defend and hold harmless [100 Summer Owner, Rockhill, and their respective shareholders, stockholders, officers, directors, principals, partners, beneficiaries, subsidiaries, employees and Affiliates] from and against any and all liability, claims, demands, losses, damages, actions, costs and expenses (including attorneys' fees and investigation costs), payments, recoveries and judgments arising out of, in connection with, or caused in any manner by…the acts or omissions of [Sky Safety], and its directors, officers, employees, contractors, subcontractors and agents, which constitute negligence, fraud, breach of [the agreement], breach of fiduciary duty, willful, reckless or criminal misconduct…or the performance or failure to perform any Services under [the agreement]." *See* **Exhibit B** § 22.

30. In addition, under the agreement, Sky Safety was required to, throughout the duration of the agreement, purchase and maintain, at its expense, and from time to time renew, such insurance as will protect Sky Safety and the defendants/third-party plaintiffs from claims which may arise out of or result from the performance of the agreement, and to name the defendants/third-party plaintiffs as additional insureds to said policy. *See* **Exhibit B** § 35.

31. The decedent's alleged fall and death on October 23, 2023, which is the subject of the primary plaintiff's Complaint, was the direct result of Sky Safety's negligence and/or gross negligence during the performance of the services under the agreement including its substandard, negligent, and/or grossly negligent inspection, repair, and/or maintenance of RDS and fall protection systems, its willful exposure of its employees to fall hazards, and/or its failures to adequately train its employees.

32. Accordingly, under both the insurance and indemnification provisions of the agreement with Sky Safety, all three of the defendants/third-party plaintiffs are entitled to Sky Safety's defense and indemnification with respect to the primary plaintiff's claims and lawsuit.

## IV. THE CONTRACT WITH AMERICAN ANCHOR

33. On, September 28, 2023, third-party defendant, American Anchor, entered into an agreement with 100 Summer Owner to provide services, from October 1, 2023, through September 31, 2024, related to the inspection of all fall protection equipment on the roof of the subject building and to ensure said fall equipment was operating as originally designed and is safe for its intended use. *See* American Anchor Agreement (attached hereto as **Exhibit C**).

34. In addition, under this agreement, American Anchor was required to "indemnify, defend and hold harmless [100 Summer Owner, Rockhill, and their respective shareholders, stockholders, officers, directors, principals, partners, beneficiaries, subsidiaries, employees and Affiliates] from and against any and all liability, claims, demands, losses, damages, actions, costs and expenses (including attorneys' fees and investigation costs), payments, recoveries and judgments arising out of, in connection with, or caused in any manner by…the acts or omissions of [American Anchor],

and its directors, officers, employees, contractors, subcontractors and agents, which constitute negligence, fraud, breach of [the agreement], breach of fiduciary duty, willful, reckless or criminal misconduct…or the performance or failure to perform any Services under [the agreement].” *See* **Exhibit C** § 22.

35. Further, under this agreement, American Anchor, was required to, throughout the duration of the agreement, purchase and maintain, at its expense, and from time to time renew, such insurance as will protect American Anchor and the defendants/third-party plaintiffs from claims which may arise out of or result from the performance of the agreement, and to name the defendants/third-party plaintiffs as additional insureds to said policy. *See* **Exhibit C** § 35.

36. The decedent's alleged fall and death on October 23, 2023, which is the subject of the primary plaintiff's Complaint, was the direct result of American Anchor's negligence and/or gross negligence in the performance of its services pursuant to the agreement including its negligent inspection, repair, maintenance, and/or failure to warn.

37. Accordingly, under both the insurance and indemnification provisions of the agreement with Sky Safety, all three of the defendants/third-party plaintiffs are entitled to Sky Safety's defense and indemnification with respect to the primary plaintiff's claims and lawsuit.

**COUNT I – BREACH OF CONTRACT**
**Defendants/Third-Party Plaintiffs v. Wiss, Janey, Elstner Associates, Inc.**

38. The defendants/third-party plaintiffs repeat and incorporate by reference herein, each and every allegation contained in Paragraphs 1-37 above, as if expressly rewritten and stated herein.

39. In violation of its contractual obligations, WJE, has failed and/or refused to assume its contractual duties, obligations and responsibility to defend and/or indemnify the defendants/third-party plaintiffs in connection with the primary plaintiff's claims against them in this lawsuit.

40. WJE is therefore liable to the defendants/third-party plaintiffs for breach of its contractual obligations to defend and indemnify the defendants/third-party plaintiffs in connection with the primary plaintiff's claims against them.

Wherefore, the defendants/third-party plaintiffs demand judgment against the third-party defendant, WJE, for breach of its contractual duty to defend and indemnify the defendants/third-party plaintiffs in this action, together with attorney's fees and costs.

**COUNT II – INDEMNIFICATION**
**Defendants/Third-Party Plaintiffs v. Wiss, Janey, Elstner Associates, Inc.**

41. The defendants/third-party plaintiffs repeat and incorporate by reference herein, each and every allegation contained in Paragraphs 1-40 above, as if expressly rewritten and state herein.

42. The third-party defendant, WJE, is contractually obligated to defend and indemnify the defendant/third-party plaintiffs pursuant to the terms and conditions of the Professional Services Agreement.

43. If the defendants/third-party plaintiffs are found liable to the primary plaintiff, which liability is specifically denied, the defendants/third-party plaintiffs state that their liability is strictly vicarious and is due solely to the acts, omissions, negligence, gross negligence, and/or conduct of the third-party defendant, WJE.

Wherefore, the defendants/third-party plaintiffs demand judgment for indemnification from the third-party defendant, WJE, together with attorney's fees and costs.

**COUNT III – CONTRIBUTION**
**Defendants/Third-Party Plaintiffs v. Wiss, Janey, Elstner Associates, Inc.**

44. The defendants/third-party plaintiffs repeat and incorporate by reference herein, each and every allegation contained in Paragraphs 1-43 above, as if expressly rewritten and state herein.

45. The defendants/third-party plaintiffs deny any liability to the primary plaintiff and state that any alleged damages of the primary plaintiff were proximately caused, in whole or in part, by the negligence, gross negligence, acts, omissions, and/or conduct of the third-party defendant, WJE.

46. Accordingly, the defendants/third-party plaintiffs state that, to the extent that they are found liable for all or part of the primary plaintiff's alleged damages, which liability is specifically denied, then the third-party defendant, WJE, is jointly liable in Contribution to the defendants/third-party plaintiffs under Massachusetts General Laws Chapter 231B for its pro rata share of liability to the primary plaintiff.

Wherefore, the defendants/third-party plaintiffs demand judgment for contribution from the third-party defendant, WJE, together with attorney's fees and costs.

**COUNT IV – BREACH OF CONTRACT**
**Defendants/Third-Party Plaintiffs v. Sky Safety, Inc.**

47. The defendants/third-party plaintiffs repeat and incorporate by reference herein, each and every allegation contained in Paragraphs 1-46 above, as if expressly rewritten and state herein.

48. In violation of its contractual obligations, Sky Safety, has failed and/or refused to assume its contractual duties, obligations, and responsibility to defend and/or indemnify the defendants/third-party plaintiffs in connection with the primary plaintiff's claims against them in this lawsuit.

49. Sky Safety is therefore liable to the defendants/third-party plaintiffs for breach of its contractual obligations to defend and indemnify the defendants/third-party plaintiffs in connection with the primary plaintiff's claims against them.

Wherefore, the defendants/third-party plaintiffs demand judgment against the third-party defendant, Sky Safety, for breach of its contractual duty to defend and indemnify the defendants/third-party plaintiffs in this action, together with attorney's fees and costs.

**COUNT V – INDEMNIFICATION**
**Defendants/Third-Party Plaintiffs v. Sky Safety, Inc.**

50. The defendants/third-party plaintiffs repeat and incorporate by reference herein, each and every allegation contained in Paragraphs 1-49 above, as if expressly rewritten and state herein.

51. The third-party defendant, Sky Safety, is contractually obligated to defend and indemnify the defendant/third-party plaintiffs pursuant to the terms and conditions of the Sky Safety Agreement.

52. If the defendants/third-party plaintiffs are found liable to the primary plaintiff, which liability is specifically denied, the defendants/third-party plaintiffs state that their liability is strictly vicarious and is due solely to the acts, omissions, negligence, gross negligence, and/or conduct of the third-party defendant, Sky Safety.

Wherefore, the defendants/third-party plaintiffs demand judgment for indemnification from the third-party defendant, Sky Safety, together with attorney's fees and costs.

**COUNT VI – BREACH OF CONTRACT**
**Defendants/Third-Party Plaintiffs v. American Anchor, Inc.**

53. The defendants/third-party plaintiffs repeat and incorporate by reference herein, each and every allegation contained in Paragraphs 1-52 above, as if expressly rewritten and state herein.

54. In violation of its contractual obligations, American Anchor, Inc., has failed and/or refused to assume its contractual duties, obligations and responsibility to defend and/or indemnify the defendants/third-party plaintiffs in connection with the primary plaintiff's claims against them in this lawsuit.

55. American Anchor is therefore liable to the defendants/third-party plaintiffs for breach of its contractual obligations to defend and indemnify the defendants/third-party plaintiffs in connection with the primary plaintiff's claims against them.

Wherefore, the defendants/third-party plaintiffs demand judgment against the third-party defendant, American Anchor, for breach of its contractual duty to defend and indemnify the defendants/third-party plaintiffs in this action, together with attorney's fees and costs.

**COUNT VII – INDEMNIFICATION**
**Defendants/Third-Party Plaintiffs v. American Anchor, Inc.**

56. The defendants/third-party plaintiffs repeat and incorporate by reference herein, each and every allegation contained in Paragraphs 1-55 above, as if expressly rewritten and state herein.

57. The third-party defendant, American Anchor, is contractually obligated to defend and indemnify the defendant/third-party plaintiffs pursuant to the terms and conditions of the Agreement.

58. If the defendants/third-party plaintiffs are found liable to the primary plaintiff, which liability is specifically denied, the defendants/third-party plaintiffs state that their liability is strictly vicarious and is due solely to the acts, omissions, negligence, gross negligence, and/or conduct of the third-party defendant, American Anchor.

Wherefore, the defendants/third-party plaintiffs demand judgment for indemnification from the third-party defendant, American Anchor, together with attorney's fees and costs.

**COUNT VIII – CONTRIBUTION**
**Defendants/Third-Party Plaintiffs v. American Anchor, Inc.**

59. The defendants/third-party plaintiffs repeat and incorporate by reference herein, each and every allegation contained in Paragraphs 1-58 above, as if expressly rewritten and state herein.

60. The defendants/third-party plaintiffs deny any liability to the primary plaintiff and state that any alleged damages of the primary plaintiff were proximately caused, in whole or in part, by the negligence, gross negligence, acts, omissions, and/or conduct of the third-party defendant, American Anchor.

61. Accordingly, the defendants/third-party plaintiffs state that, to the extent that they are found liable for all or part of the primary plaintiff's alleged damages, which liability is specifically denied, then the third-party defendant, American Anchor, is jointly liable in Contribution to the defendants/third-party plaintiffs under Massachusetts General Laws Chapter 231B for its pro rata share of liability to the primary plaintiff.

Wherefore, the defendants/third-party plaintiffs demand judgment for contribution from the third-party defendant, American Anchor, together with attorney's fees and costs.

**DEFENDANTS/THIRD-PARTY PLAINTIFFS**
**DEMAND A TRIAL BY JURY ON ALL ISSUES.**

Respectfully submitted,

The defendants/third-party plaintiffs,
Rockhill Management, L.L.C., misnamed,
Rockpoint Group, L.L.C., misnamed, and
100 Summer Owner LLC,
By their attorneys,

Luana DiSarra Scavone, BBO # 650681
Griffen C. Rose, BBO #711585
WOOD, SMITH, HENNING & BERMAN LLP
One Marina Park Drive, Suite 1410
Boston, Massachusetts 02210
Telephone: 617.675.0474
Fax: 617.830.8651
lscavone@wshblaw.com
grose@wshblaw.com

Dated: October 27, 2025

## CERTIFICATE OF SERVICE

I, Luana DiSarra Scavone, hereby certify that on this 27th day of October 2025, that a true and correct copy of the foregoing document has been served via email upon all counsel of record as follows:

Jeffrey N. Catalano, Esq.
Keches Law Group, P.C.
2 Granite Ave., Suite #400
Milton, MA 02186
jcatalano@kecheslaw.com

Luana DiSarra Scavone

# EXHIBIT A

# PROFESSIONAL SERVICES AGREEMENT

This PROFESSIONAL SERVICES AGREEMENT ("Agreement") is made and entered into as of this 29th day of July, 2021, by and between 100 Summer Owner, LLC, a Delaware Limited Liability Company ("Owner") and Wiss, Janney, Elstner Associates, Inc., an Illinois corporation ("Professional") with respect to the facts and provisions set forth below.

Owner is the owner of certain real property located at 100 Summer Street, Boston, MA ("Property"). Owner desires to retain Professional to perform certain professional **consulting** services as described with greater particularity on **Exhibit A** attached hereto.

IN CONSIDERATION of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Professional hereby enter into this Agreement on the terms and conditions contained herein.

## AGREEMENT

1. Services and Responsibilities.

1.1. Basic Services. Professional shall perform, in accordance with the terms and conditions herein, the services described on **Exhibit A** attached hereto or such other services referenced as Basic Services in this Agreement (collectively, "Basic Services"). Professional's Basic Services also include the services described Professional's proposal dated July 14th, 2021 (excluding any general terms or conditions, statement of fees, limitations on liability, insurance, indemnification, or similar provisions, which are superseded in their entirety by this Agreement, "Proposal") attached to **Exhibit A**. The Proposal is being attached solely for the limited purpose of describing the parties understanding of the scope of the Project and Basic Services to be performed by Professional. The provisions of this Agreement shall control in the event of any conflict between the Proposal and this Agreement.

1.2. Additional Services. Upon prior written authorization by Owner, Professional shall provide such additional services (which are not set forth on **Exhibit A** or reasonably inferable therefrom, or incidental to, the Basic Services) as may be reasonably requested by Owner ("Additional Services") and accepted in writing by Professional. The Basic Services and Additional Services are collectively referred to herein as the "Services". All Additional Services must be authorized by Owner in writing, in advance, which authorization shall identify the Additional Services to be performed, include a mutually agreed upon time schedule and a mutually agreed upon price. All Additional Services shall be governed by the terms, conditions and provisions of this Agreement. ANY WORK UNDERTAKEN BY PROFESSIONAL THAT IS NOT INCLUDED IN THE BASIC SERVICES NOR PART OF ANY ADDITIONAL SERVICES AUTHORIZED IN THE MANNER SET FORTH HEREIN SHALL BE AT PROFESSIONAL'S SOLE EXPENSE AND WITHOUT REIMBURSEMENT OF ANY KIND FROM OWNER.

Notwithstanding anything to the contrary in the foregoing, in no event shall any services be deemed an Additional Service hereunder or justification for any additional payment of any kind if such services were (i) required due to errors, omissions or negligence of Professional or (ii) required due to Professional's failure to adhere to the Schedule (as defined herein) or its failure to otherwise perform its obligations in accordance with the requirements of this Agreement, or (iii) performed to modify Professional's documents in order to obtain any permit or governmental approval.

1.3. Standard of Care. The standard of care for all services performed by Professional, its employees, agents and sub-contractors, under this Agreement will be that degree of care and skill exercised by qualified and experienced members of Professional's profession practicing under similar conditions in the same locality and in connection with projects of similar complexity, magnitude and quality. Professional shall assign only suitably licensed, qualified, trained and experienced personnel for the performance of any Services.

1.4. Schedule for Basic Services. Professional shall perform all Basic Services (or any part thereof) in consultation with Owner, and in such manner, sequence and timing so as to best coordinate with Owner's requirements pursuant to and in accordance with the schedule set forth in **Exhibit B** ("Schedule"). Professional shall, at all times during the term of this Agreement, employ sufficient personnel to complete all Services in accordance with the Schedule. The Schedule shall include allowances for periods of time for Owner's review and approval of submissions and for required review and approval of all City, governmental, quasi-governmental and public authorities having jurisdiction over the Services or any aspect thereof (collectively, "Authorities"). Any time period provided in the current Schedule shall not be exceeded without the prior written consent of Owner. Notwithstanding any language above to the contrary, Professional shall perform all Services not specifically covered by a schedule in a reasonably expeditious manner consistent with good professional practices.

1.5. Liens and Encumbrances. Provided Owner is not in breach of its undisputed payment obligations under this Agreement, Professional shall indemnify, defend and hold harmless Owner from all liens for labor performed, materials supplied or used by Professional and/or any other person or entity in connection with the Services undertaken hereunder. If any liens are filed as a result of the Services, and provided Owner is not in default of its payment obligations hereunder, Professional shall promptly cause such liens to be bonded over or otherwise released.

1.6. Approval from Authorities. Subject to the provisions set forth in **Exhibit A**, Professional shall (a) make all necessary applications and provide all information required in connection therewith for any approvals, permission, licenses, or permits from the Authorities which are necessary for the implementation of the Services, and (b) coordinate with Owner **Rockhill Management, L.L.C.** and any of **[its/their]** consultants or representatives at each stage of the Services for presentation, review and approval before proceeding to a subsequent phase.

1.7. Services Prior to Execution. Notwithstanding the fact that this Agreement is executed as of the date first set forth above, the parties recognize that a portion of the Services required hereunder may have been performed prior to such date, all of which Services shall be governed by the terms and conditions of this Agreement and shall be deemed to be a part of the Professional's Project Documents, to the extent pre-approved by Owner, in writing. Professional shall not be entitled to any compensation for such prior activities and Services except as expressly provided herein. Without limiting the foregoing, all of Professional's liabilities and obligations to Owner hereunder shall apply to all work or Services provided by Professional for the Project prior hereto, notwithstanding the fact that such work or Services may have been performed prior to the date hereof pursuant to prior negotiations, representations, agreements, understandings or otherwise.

1.8 Confidentiality.

(a) Professional acknowledges that all information disclosed by Owner or its Manager to Professional for purposes of performing the Services, or which come to the attention of Professional during the course of performing such Services, constitutes a valuable asset of and is proprietary to Owner and/or property manager ("Manager"). Professional also acknowledges that Owner, as a party in the business community, may have fiduciary responsibilities to its tenants or customers to keep their records confidential and proprietary. Professional shall not disclose said information or knowingly permit its employees, officers or agents to disclose said information, to any non-employee of Professional or to any employee of Professional not having a specific need-to-know in performing the Services authorized by Manager and Owner. Professional shall not record this Agreement or any notice or short form of this Agreement.

(b) Professional further agrees to instruct its employees, officers and agents not to sell, lease, assign, transfer or reveal to any organization, company or individual any of said information whether oral or written, without the prior written consent of Owner, and agrees to take all reasonable steps necessary to ensure fulfillment of this obligation.

(c) In the event that a subpoena or other legal process is served upon Professional that in any way concerns information disclosed by Owner or Manager to Professional, Professional agrees to notify Owner and

Manager immediately upon receipt of such subpoena or other legal process and will reasonably cooperate with Manager and Owner, at Owner's expense, in any lawful effort by Owner and/or Manager to contest the legal validity of such subpoena or other legal process. This Section 1.8 shall survive expiration or earlier termination of this Agreement.

2. Compensation and Reimbursable Expenses.

2.1. Fee for Basic Services. In return for the satisfactory performance of the Basic Services, as full and complete compensation for the Basic Services, Professional shall be entitled to a fee in the amount of forty-four thousand, five hundred and No/100 Dollars ($44,500.00) ("Basic Compensation"), as more particularly described in **Exhibit B**. Reimbursable expenses for the direct costs incurred by Professional in performing the Basic Services shall be paid without mark-up and are identified in **Exhibit B** ("Reimbursable Expenses").

2.2. Payment by Owner. Professional shall submit monthly invoices to Owner on or before the tenth (10th) day of the month in the form of a written invoice ("Application for Payment") showing in complete detail the percentage of completion of the Services for the previous month as of the date of the statement, and all previous payments on behalf of Services. Applications for Payment shall be in a form acceptable to Owner and shall be accompanied by (i) vouchers, invoices and other documentation satisfactory to Owner evidencing the amounts set forth in such application, (ii) a request for Reimbursable Expenses and authorized Additional Services, if any, and (iii) conditional lien releases from the Professional for the current pay period and unconditional lien releases from Professional for all prior periods, both in form required by Massachusetts law. Payments shall be due within thirty (30) days of receipt of Application for Payment. Professional understands and agrees that any payment by Owner hereunder shall not be deemed approval of any Services or work or relieve Professional of its responsibility for defective or non-conforming Services or work.

2.3. Owner's Rights. Owner may refuse to approve any portion of an Application for Payment and shall have the right to withhold payment to the extent of that portion of the application which is disapproved in the event (i) Professional fails to submit with any application all appropriate back-up, including the lien releases and waivers required by this Agreement, (ii) Owner has disapproved all or a portion of the Services for which Professional is requesting payment, (iii) claims have been filed with regard to the Services or liens have been recorded against the Project resulting from the Services, or (iv) any breach or default under this Agreement by Professional. In no event shall any review, approval, comment or evaluation of any Project Document by Owner relieve Professional of any liability or responsibility therefor under this Agreement or as provided by law.

3. Ownership and Use of Documents. Upon payment for services rendered, all documents, drawings, photographs, presentations, renderings, designs, specifications, plans, data, calculations, drafts, final reports, work papers, memoranda, graphics and other materials including duplicates thereof generated or compiled pursuant to this Agreement together with all copyright privileges (collectively, "Project Documents") are instruments of professional service but shall remain the exclusive property of Owner, notwithstanding that Owner may choose, at its option, to leave the original or a copy of any Project Documents in the possession of Professional for the mutual convenience of the parties. The Project Documents shall constitute "works made for hire" under the Federal 1976 Copyright Act (as amended, or any successor statute thereto), and Owner shall own all rights to copyright the Project Documents. For purposes of copyright protection, the Project Documents shall include those details and/or designs generated or created specifically for the Services or the manner in which such details and/or designs are combined for the Services and shall not extend to the portion of the Project Documents which include details and/or designs that are generally recognized as standard or of common usage in the industry. Owner understands and acknowledges that Professional may use such details and/or designs that are generally recognized as standard or of common usage in the industry on projects other than the Services.

4. Professional's Representations and Covenants

4.1. Professional's Qualification. Professional represents to Owner that Professional is duly licensed as required by law and has the skill and professional competence, financial solvency and resources,

expertise, qualifications, appropriate licenses and experience to undertake the obligations imposed by this Agreement and imposed by the necessary requirements of a project of the magnitude of the Services. Professional understands that Owner has relied upon this representation without independent investigation as a material inducement to enter into this Agreement.

4.2. Compliance with Laws. Professional agrees that as part of its Basic Services Professional shall review, and all of its Services and Project Documents produced under this Agreement shall comply with, all applicable federal, state and local laws, statutes, ordinances, codes and regulations, including, but not limited to, applicable governmental land use and zoning ordinances, regulations and codes and covenants, conditions, and restrictions of record, conditions of approval and mitigation measures and requirements as applicable to the Project and/or such Services, environmental laws, and all accessibility requirements of the Americans with Disabilities Act ("ADA") (collectively, "Applicable Laws").

4.3. Conditions of Work. Professional's duly authorized representative has visited the Project site, familiarized itself with governmental requirements relating to its Services and the local conditions under which the Services required hereunder are to be performed and coordinated its observations with all of the requirements for the Professional's Services hereunder.

5. Disputes; Attorney's Fees.

5.1. Professional's Duty to Complete Work. During all disputes, actions, claims or other matters arising out of or relating to this Agreement or the breach thereof, Professional shall carry on its duties hereunder, provided Owner is not in default in its obligation to pay Professional all undisputed amounts pursuant to the provisions of this Agreement.

5.2. Attorneys'; Fees and Costs. Should legal action or arbitration be necessary to enforce or interpret any of the provisions of this Agreement, the prevailing party in such action or arbitration shall be entitled to all costs and reasonable attorneys' fees incurred therein.

6. Termination/Suspension/Default.

6.1. Default of Professional. The failure of Professional to perform Professional's obligations or any of them hereunder and/or to comply with the covenants, conditions and provisions hereof shall constitute a default by Professional. In the event of such default, Owner may: (a) terminate this Agreement; or (b) withhold the payment of any monies due Professional until the default and breach of Professional has been cured.

6.2. Right to Terminate. This Agreement may be terminated by Owner with or without cause upon ten (10) days' prior written notice to Professional or immediately upon sale of the Property. Upon receipt by Professional of such notice, Professional shall immediately cease all Services under the Agreement except for the items required to comply with this **Section 6**. Professional may terminate this Agreement if Owner fails to make any undisputed payment to Professional in accordance with the provisions of this Agreement and such failure continues for a period of thirty (30) days following receipt by Owner of Professional's written notice of its intent to terminate this Agreement.

6.3. Payment Upon Termination. In the event of termination not the fault of Professional, Professional shall be compensated for Services satisfactorily performed prior to termination, together with any Reimbursable Expenses then due. In the event of any termination of Professional for cause, Professional shall be compensated for the portion of its services satisfactorily performed prior to such termination, together with Reimbursable Expenses then due; provided, however, that Owner shall have the right to deduct therefrom any sums as may be determined by Owner in its sole discretion as necessary to cover all costs, claims or damages incurred by the Owner or likely to be incurred by the Owner as a result thereof. Owner shall provide Professional with a written explanation of any such offset.

6.4. Submittal of Reports. Upon any termination of this Agreement, Professional shall immediately deliver to Owner a written status report of the work completed to date, together with possession of the Project Documents (and electronically if requested by Owner), provided Owner pays Professional as set forth above for all undisputed Services. Materials so delivered shall be the property of Owner subject to the provisions of **Section 3** above.

7. Representatives. Owner and Professional hereby designate the individuals identified on **Exhibit B**, or such other person as Owner or Professional may from time to time designate in writing to the other party, as Owner's and Professional representatives. Such representatives are authorized to act on behalf and in the name of Owner and Professional in connection with the Services.

8. Insurance and Indemnity.

8.1. Insurance. Prior to commencement of any Services hereunder, Professional shall provide evidence to Owner of, and shall maintain in full force and effect at all times, the insurance required in **Exhibit C** attached hereto.

8.2. Indemnification. To the fullest extent permitted by law, Professional shall indemnify, protect, defend and hold harmless Owner and its partners, members, subsidiaries and affiliated companies, and all of their respective employees, partners, members, stockholders, officers, directors, agents, lenders, successors and assigns (collectively, "Indemnitees") from any and all expenses, costs (including, without limitation, attorneys' fees and witness fees), losses, claims, demands, causes of action, damages, judgments, judgment liens, encumbrances, orders, awards, penalties or other liabilities (collectively, "Claims") which arise from or relate to (i) the negligent acts, errors and/or omissions of Professional, or its agents, employees, anyone employed directly or indirectly by any of them or for whose acts they may be liable or any or all of them in connection with the performance of the Services; (ii) Professional's presence at the Property; (iii) any claims that are or could be brought under workers' compensation acts and other employee benefit acts with respect to Professional's employees arising out of the Services; and (iv) Professional's failure to fulfill its obligations under the Agreement. The indemnification obligations of Professional hereunder shall not be limited by the amounts or types of insurance which Professional is required to carry under this Agreement or which Professional in fact carries. The indemnity set forth in this **Section 8.2** shall survive the expiration or termination of this Agreement until such time as action against the Indemnitees on account of any matter covered by such indemnity is barred by the applicable statute of limitations.

8.3. Limitation on Liability. Notwithstanding anything to the contrary set forth herein, no general or limited partner in or of Owner or its Manager, whether direct or indirect, or any direct or indirect partners in such partners or any disclosed or undisclosed officers, shareholders, principals, directors, employees, members, partners, servants or agents of Owner or its Manager shall be personally liable for the performance of Owner's obligations under this Agreement. The liability of Owner (including any assignee or successor of Owner) shall be limited to Owner's interest in the Property. In the event this Agreement is executed by Owner's Manager on behalf of Owner, Professional acknowledges and agrees that the Manager is executing this Contract in its capacity as Owner's agent and that Manager shall have no liability or obligation to Professional under this Agreement.

9. Miscellaneous.

9.1. Successors and Assigns. Owner and Professional, respectively, bind themselves, their successors, assigns and legal representatives to the other party to this Agreement and this Agreement shall inure to the benefit of Owner and Professional, respectively, and their successors, assigns and legal representatives. Professional shall not assign or transfer any interest in this Agreement or delegate any duties under this Agreement without the prior written consent of Owner, which consent may be withheld in Owner's sole and absolute discretion. Owner shall have the absolute right without the consent of Professional to assign this Agreement to its lender, successor owner of the Property, or to an affiliated or related entity (including any entity controlled by or under common control with Owner) provided that the entity receiving assignment of the Agreement agrees to all the terms and conditions of this Agreement.

9.2. Notices. Any notice, demand, or statement required or designated to be given under this Agreement shall be in writing and shall be either personally served, sent by overnight delivery, or by email to the respective address of the other party (provided that any notice provided by email shall be immediately followed by a copy sent via overnight delivery), as indicated in **Exhibit B**, until notice of a different address is given in the manner specified in this Section. Notices, demands, or statements shall be deemed received as follows: (a) if personally served, on the date of such service, (b) if sent by overnight delivery, one (1) business day after timely delivery to the overnight delivery services, and (d) if sent by facsimile or email, on the date of such facsimile or email transmission provided a written confirmation of receipt is generated.

9.3. Entire Agreement. The terms of this Agreement are intended by the parties to be a final expression of their understanding with respect to the subject matter hereof. The parties further intend that this Agreement constitutes the complete and exclusive statement of its terms. No addition to, deletion from or modification of any term or provision of this Agreement shall be effective unless it is made in a writing signed by the parties hereto.

9.4. Professional's Status. Professional has no right or authority of any kind to act as the representative of or on behalf of Owner. Professional is an independent contractor and not an agent, partner or employee of Owner. Professional acknowledges and agrees that it is not an employee of Owner for federal or state tax purposes, and that it shall be solely responsible for its and its employees' workers' compensation insurance premiums. Nothing contained herein shall be deemed or construed to create any association, partnership, joint venture or relationship of principal and agent or master and servant or employer and employee between the parties hereto or any affiliates or subsidiaries thereof, or to provide either party with the right, power or authority whether expressed or implied, to create any duty or obligation on behalf of the other party or to bind the other party by virtue of this Agreement, except as expressly provided in this Agreement.

9.5. No Waiver of Breach. No failure by Owner or Professional to insist upon the strict performance of any term hereof or to exercise any right, power or remedy upon a breach hereof by the other party shall constitute a waiver of any such breach, right or any such term. No waiver of any breach shall affect or alter this Agreement, which shall continue in full force and effect, or the rights of Owner or Professional with respect to any other then existing or subsequent breach. All waivers made by Owner or Professional must be in writing.

9.6. Applicable Law. This Agreement shall be governed by, and construed according to, the laws of the State in which the Project is located.

9.7. Waiver of Jury Trial. The Professional hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

9.8. Severability. Should any provision of this Agreement be unenforceable, the remaining terms and conditions of this Agreement shall remain in full force and effect.

9.9. Time. Time is of the essence with respect to this Agreement and the performance of each of its provisions.

9.10. Exhibits. The Exhibits and any addenda attached hereto are hereby incorporated herein by this reference.

9.11. Authority. If Professional is a partnership, corporation, or limited liability company, Professional represents and warrants that (i) it has full right, power and authority to execute, deliver and carry out the provisions of this Agreement and (ii) the execution and delivery of this Agreement and the performance and observance of all of the terms, conditions and obligations contained in this Agreement and such other documents, have been duly authorized by Professional.

9.12. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but both of which, taken together, shall constitute one and the same Agreement. The parties acknowledge and agree that this Agreement may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include faxed versions of an original signature or electronically scanned and transmitted versions (e.g., via pdf) of an original signature.

9.13. Limitation on Claims. Professional agrees that it shall have no recourse to any assets of any partner, director, officer, employee or other representative of Owner for the satisfaction of any of Owner's obligations hereunder.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date and year first above written.

**OWNER:**

**100 Summer Owner LLC,**
a Delaware Limited Liability Company.

By:________________________

Name: Ron J. Hoyl

Title: Vice President

**PROFESSIONAL:**

**Wiss Janney, Elstner Associates, Inc.**
an Illinois Corporation.

By: Emma Cardini

Name: Emma Cardini

Title: Associate Principal

By:________________________

Name: ________________________

Title: ________________________

**EXHIBIT A**

**BASIC SERVICES**

Professional's Services will consist of the following:

The exterior walls at 100 Summer Street are more than 125 feet tall and up-close inspection is therefore required. We propose to perform the following scope of services to assist you with Ordinance compliance:

1. Visually inspect all exterior walls and appurtenances with binoculars from grade or accessible roofs. From the accessible roofs, WJE will document conditions observed in the field on inspection data sheets. We anticipate that this task will require one day for two professionals;

2. Visually inspect portions of the exterior walls up-close using industrial rope access techniques. We anticipate that this task will require two days to complete with a crew of four professionals, and we will perform up to eighteen drops total;

3. Notify you of unsafe conditions observed during the inspection; and

4. Prepare the Facade Ordinance inspection letter report and submit along with the $100 filing fee to the City of Boston.

## EXHIBIT B

## PROJECT SPECIFIC INFORMATION

1. Basic Compensation: [redacted]

2. Hourly Rate Schedule. Such rates include without limitation, all costs of mandatory and customary contributions and benefits related thereto, employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

**Schedule of Hourly Time Charges**

| Professional Staff | | Professional Support Staff | |
|---|---|---|---|
| Senior Principal | [redacted] | Senior Specialist | [redacted] |
| Principal | [redacted] | Specialist | [redacted] |
| Associate Principal | [redacted] | | [redacted] |
| Senior Associate | [redacted] | Senior Technician | [redacted] |
| Associate III | [redacted] | Technician II | [redacted] |
| Associate II | [redacted] | Technician I | [redacted] |
| Associate I | [redacted] | | [redacted] |

3. List of Reimbursable Expenses. Professional must submit receipts with all invoices for Reimbursable Expenses fully documenting all monies spent on each line item contained in such invoice. The following are allowable reimbursable expenses: actual, reasonable, necessary and documented costs for mail, delivery and courier charges, local mileage, printing and reproduction costs, required travel expenses if approved in advance in writing by Owner, and other reasonable expenses to the extent approved in advance in writing by Owner.

4. Schedule:

Commencement date of Services: August 1, 2021
Completion date of Services: Est. August 30, 2021

5. Notice Address/Representatives

Owner: 100 Summer Owner, LLC

500 Boylston Street
21st Floor
Boston, MA 02116
Attn: John Stonestreet
Phone: 617-437-8400
Fax: ________________________
Email: jstonestreet@rockhillmanagement.com

Professional:

311 Summer Street, Suite 300
Boston, MA 02210
Attn: Emma Cardini
Phone: 617-840-7957
Fax: ________________________
Email: ecardini@wje.com

Representative:

Name: Patricia Walsh
Phone: 857-362-0060
Email: pwalsh@rockhillmanagement.com

Representative:

Name: Emma Cardini
Phone: 617-840-7957
Email: ecardini@wje.com________________

# EXHIBIT C

## INSURANCE

1. Insurance Requirements. The Professional shall purchase from and maintain such insurance as will protect the Professional from claims which may arise out of or result from the Professional's services on the Project and for which the Professional may be legally liable, whether such services be by the Professional or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable. Such insurance shall include insurance coverages in amounts not less than those shown below, and shall comply with all of the provisions in this Insurance Exhibit.

1.1 Workers' Compensation. Workers' compensation insurance for statutory benefits limits of the applicable labor code(s) and workers' compensation law(s) and so-called "Coverage B" employer's liability insurance with minimum limits of $1,000,000 each accident for Bodily Injury by accident, $1,000,000 each employee for Bodily Injury by disease, and $1,000,000 policy limit for Bodily Injury by disease. Such insurance shall be endorsed to include Other States Coverage and to include a Waiver of Our Right to Recover from Others Endorsement in favor of the Owner.

1.2 Commercial General Liability. Commercial General Liability Insurance, alone or in combination with Umbrella Liability Insurance, with limits totaling not less than $3,000,000 per occurrence and in the aggregate covering claims for bodily injury, personal injury (with employee and contractual exclusions deleted), property damage and death. The foregoing limit is to be maintained continuously during the life of the Project.

1.3 Professional Liability. Professional Liability, with limits of not less than $3,000,000. The Professional Liability policy shall cover liability to Owner imposed by law or contract arising out of an error, omission or negligent act in the performance, or lack thereof, of professional services and any physical property damage, bodily injury or death resulting therefrom and shall include a contractual liability endorsement covering the Professional's indemnification set forth in the Agreement. The Professional shall maintain such coverage for a period of not less than ten years following substantial completion of the Project. The provisions of this Section shall survive the expiration or termination of this Agreement.

1.4 Automobile Liability. Automobile liability insurance covering all owned, non-owned, and hired vehicles for all operations both on and off the Project site, with a minimum limit of $1,000,000 combined single limit per accident for bodily injury and property damage.

1.5 Umbrella/Excess Liability Insurance in the minimum amount of $5,000,000 covering both Bodily Injury and Property Damage on a form that is not more restrictive than underlying and providing excess coverage to the Commercial General Liability, Automobile Liability, and Employers Liability.

2. Additional Requirements.

2.1 Occurrence Basis. All insurance (except for Professional's professional liability insurance, which may be written on a claims-made basis) shall be written on an occurrence basis unless the Owner approves in writing coverage on a claims-made basis.

2.2 Claims-Made Basis. The professional liability policy shall be written on a claims-made basis with retroactive coverage (allowing claims arising from acts which occur prior to the policy year of any such insurance including the entire prior period in which the Professional provides services in connection with the Project and thereafter).

2.3 Waiver of Subrogation. Professional hereby waives, releases and discharges all rights of recovery by subrogation or against Owner, any lender on the Project, the Indemnitees, and any of their consultants, subcontractors, agents, employees and representatives. A waiver of subrogation shall be effective as to any individual or entity even if such individual or entity (a) would otherwise have a duty of indemnification, contractual or otherwise, (b) did not pay the insurance premium directly or indirectly, and (c) whether or not such individual or entity has an insurable interest in the property damaged. Except for the professional liability policy, all policies shall contain a prior release clause and be endorsed to provide that each insurer thereunder waives its right of subrogation against or contribution from the Owner, its affiliates or any of their insurers.

2.4 Additional Insureds. The policies listed above under Sections 1.2 and 1.4 shall name the Owner, the Indemnitees and any lender identified by Owner as additional insureds with respect to liability arising out of or resulting from the performance of the services under the Agreement performed by or on behalf of Professional, including the general supervision of the Professional by the Owner, products and completed operations of Professional, contractual liability undertaken by Professional under the Agreement, premises occupied or used by Professional.

2.5 Primary Coverages. Except for the professional liability and workers' compensation policies, all policies shall provide for the coverage to be primary (including coverage for the additional insureds) and not contributory with any insurance carried or maintained by any of the Indemnitees.

2.6 Deductibles and Self-Insured Retention. Any deductibles or self-insured retentions under the above policies must be declared to and approved in advance by the Owner.

3. Verification of Coverage. Prior to the commencement of the services hereunder, and continuously throughout the period the services are provided, Professional shall furnish to the Owner certificates (and, not less than ten (10) days prior to expiration of any insurance policies required hereunder, renewal certificates) of insurance evidencing compliance with the obligations under this Insurance Exhibit, including, without limitation, evidence of the endorsements required hereunder. Each certificate shall provide for ten (10) days' prior written notice to the Owner in the event of cancellation of the insurance coverages. The certificate and evidence of endorsements for each policy shall be signed by a person authorized by each insurer to bind coverage on its behalf. The Owner reserves the right at any time to require that Professional provide the Owner with complete, certified copies of any or all insurance policies.

4. Acceptability of Insurers. All insurance carried in accordance with this Insurance Exhibit shall be provided through insurers authorized to conduct business in the state where the services are to be performed and with an A.M. Best & Co. rating of no less than A VII.

5. Notice of Insurance Policy Claims. In the event Professional wishes to make any claim for recovery under any insurance policy hereunder, Professional shall give timely notification to Owner of the event giving rise to the claim, cooperate with Owner, and do all things required of it as an insured under such policy, so as to permit the policy to be complied with and a claim to be made thereunder. Professional further agrees that to the extent required under such policy, Professional shall permit and authorize full subrogation in favor of the insurers of any rights, as against any other person, firm or corporation (other than any of the Indemnitees). Professional further agrees that it shall indemnify and save harmless Owner from any and all costs, charges, expenses and liabilities incurred by Owner in making any claim on behalf of Professional under such insurance policy or policies. The obligations in this Section shall survive the termination of this Agreement.

6. Failure of Compliance with these Provisions. The failure of Professional to carry and maintain the insurance coverages under this Insurance Exhibit, shall not be deemed to limit Professional's liability or in any way limit, modify or otherwise diminish Professional's indemnification obligations contained in this Agreement. The insolvency, bankruptcy or failure of any insurance company issuing insurance for Professional, or the failure or refusal of any insurance company to pay claims shall not be held to waive any of the provisions of this Agreement. In the event Professional fails to carry and maintain the insurance specified herein, the Owner may, at its option, but without the obligation to do so, secure such insurance, and the cost thereof, plus a five percent (5%) administrative charge, shall be paid by the Professional to the Owner within ten (10) days after demand from the Owner to Professional, or, at the Owner's discretion, offset such amount against any amounts due from the Owner to Professional.

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 7/27/2021

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

PRODUCER
Greyling Insurance Brokerage
3780 Mansell Road, Suite370
Alpharetta, GA 30022

CONTACT NAME: Sam Barbera
PHONE (A/C, No, Ext): 847-753-7211 FAX (A/C, No): 847-291-9371
E-MAIL ADDRESS: sbarbera@wje.com

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Nat'l Union Fire Ins Co of Pittsburgh, PA | 19445 |
| INSURER B: Travelers Property Casualty Ins. Co. | 36161 |
| INSURER C: New Hampshire Ins. Co. | 23841 |
| INSURER D: | |
| INSURER E: | |
| INSURER F: | |

INSURED
Wiss, Janney, Elstner Associates, Inc
Attn: Sam Barbera
330 Pfingsten Rd.
Northbrook IL 60062

**COVERAGES** CERTIFICATE NUMBER: 63057284 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | ✓ COMMERCIAL GENERAL LIABILITY; CLAIMS-MADE ✓ OCCUR; ✓ Contractual Liability; GEN'L AGGREGATE LIMIT APPLIES PER: ✓ POLICY, PRO-JECT, LOC; OTHER: | ✓ | ✓ | GL9566221 | 4/1/2021 | 4/1/2022 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 25,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY; ✓ ANY AUTO; OWNED AUTOS ONLY; SCHEDULED AUTOS; ✓ HIRED AUTOS ONLY; ✓ NON-OWNED AUTOS ONLY; ✓ Comp/Coll ✓ $250/$500 ded | ✓ | ✓ | CA5721463 | 4/1/2021 | 4/1/2022 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | ✓ UMBRELLA LIAB ✓ OCCUR; ✓ EXCESS LIAB CLAIMS-MADE; DED ✓ RETENTION $ 10,000 | ✓ | ✓ | ZUP41N2517621NF | 4/1/2021 | 4/1/2022 | EACH OCCURRENCE | $ $5,000,000 |
| | | | | | | | AGGREGATE | $ $5,000,000 |
| | | | | | | | | $ |
| C<br>C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N; ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) N; If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | ✓ | WC015853342 (AOS)<br>WC015853341 (CA) | 4/1/2021<br>4/1/2021 | 4/1/2022<br>4/1/2022 | ✓ PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

WJE No. 2021.4484 - 100 Summer Street, Boston, MA

Additional Insured: 100 Summer Owner, LLC; Rockhill Management, LLC and their subsidiaries.

**CERTIFICATE HOLDER**

100 Summer Owner, LLC
c/o Rockhill Management
100 Summer Street
Boston MA 02110

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE

Matias Ormaza

© 1988-2015 ACORD CORPORATION. All rights reserved.

AGENCY CUSTOMER ID: ____________

LOC #: ____________

ACORD®

# ADDITIONAL REMARKS SCHEDULE

Page ____ of ____

| AGENCY | | NAMED INSURED |
|---|---|---|
| Greyling Insurance Brokerage | | Wiss, Janney, Elstner Associates, Inc<br>Attn: Sam Barbera<br>330 Pfingsten Rd.<br>Northbrook IL 60062 |
| POLICY NUMBER | | |
| CARRIER | NAIC CODE | EFFECTIVE DATE: |

ADDITIONAL REMARKS

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: 25 FORM TITLE: Certificate of Liability (03/16)

HOLDER: 100 Summer Owner, LLC c/o Rockhill Management

ADDRESS: 100 Summer Street Boston MA 02110

Subject to the terms, conditions, limitations and exclusions of the policies evidenced herein: The above are included as Additional Insureds when required by written contract with the Named Insured under the general liability including ongoing operations and products/completed operations and auto liability, but only with respect to services provided by the Named Insured, regarding the referenced project.

Excess/ Umbrella Liability policy follows form.

When agreed in written contract, coverage is provided on a primary and non-contributory basis, subject to the terms and conditions of the policies.

Where required by written contract Waiver of Subrogation is afforded the Additional Insureds under all listed policies, subject to the terms and conditions of the policies.


© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 7/27/2021

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

**IMPORTANT:** If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

**PRODUCER**
Greyling Insurance Brokerage
3780 Mansell Road, Suite370
Alpharetta, GA 30022

CONTACT NAME: Sam Barbera
PHONE (A/C, No, Ext): 847-753-7211
FAX (A/C, No): 847-291-9371
E-MAIL ADDRESS: sbarbera@wje.com

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A : Syndicate 2623/623 at Lloyd's | |
| INSURER B : | |
| INSURER C : | |
| INSURER D : | |
| INSURER E : | |
| INSURER F : | |

**INSURED**
Wiss, Janney, Elstner Associates, Inc
Attn: Sam Barbera
330 Pfingsten Rd.
Northbrook IL 60062

**COVERAGES** **CERTIFICATE NUMBER:** 63057337 **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY; CLAIMS-MADE / OCCUR; GEN'L AGGREGATE LIMIT APPLIES PER: POLICY / PRO-JECT / LOC; OTHER: | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | AUTOMOBILE LIABILITY; ANY AUTO; OWNED AUTOS ONLY; SCHEDULED AUTOS; HIRED AUTOS ONLY; NON-OWNED AUTOS ONLY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB / OCCUR; EXCESS LIAB / CLAIMS-MADE; DED; RETENTION $ | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N; ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBEREXCLUDED? (Mandatory in NH); If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | | | | | PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liability (Claims Made) | | | W1755E210701 | 1/1/2021 | 1/1/2023 | $3,000,000 Per Claim; $3,000,000 Annual Aggregate | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES** (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

WJE No. 2021.4484 - 100 Summer Street, Boston, MA

[redacted]

**CERTIFICATE HOLDER**

100 Summer Owner, LLC
c/o Rockhill Management
100 Summer Street
Boston MA 02110

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE

Matias Ormaza

© 1988-2015 ACORD CORPORATION. All rights reserved.

WJE

Wiss, Janney, Elstner Associates, Inc.
311 Summer Street, Suite 300
Boston, Massachusetts 02210
617.946.3400 tel
www.wje.com

July 22, 2021

Ms. Patricia Walsh
RockHill Management, LLC
100 High Street, Suite 910
Boston, MA 02110
pwalsh@rockhillmanagement.com

**100 Summer Street**
Facade Cleaning Trials
WJE No. 2021.4413

Dear Ms.Walsh:

At your request, Wiss, Janney, Elstner Associates, Inc. (WJE) has prepared this proposal for RockHill Management, LLC (RockHill) for professional consulting services related to the investigation and cleaning trials of the aluminum cladding at 100 Summer Street in Boston, Massachusetts. The following proposal includes our understanding of the of the issues and current conditions, our proposed scope of services, and associated fees for each task of our services.

## BACKGROUND

The building at 100 Summer Street, constructed in 1976, is a 32-story, steel framed office building with concrete floors cast-in-place over steel decking. The building is clad in insulated bronze anodized aluminum metal panels and single pane glass curtain wall above the ground floor. The ground floor is clad with a newer stainless steel storefront system. The curtain wall is structurally supported by steel angles and straps connected to the floor slabs and steel structure.

In 2015, WJE was contacted by the property manager and at that time there was observed visible streaking, discoloration of, and staining on the aluminum panels and windows. Streaking and discoloration were observed at several locations including at the head of vision glass below metal spandrel panels, the metal spandrel panels below the vision glass, within the metal spandrel panels between glass lites at the floor line, above and below the preformed silicone joint seals at building corners, and the length of the canopy overhangs. It is our understanding that the conditions observed in 2015 have worsened.

RockHill would like to better understand the cause of the discoloration and streaking prior to implementing a facade cleaning project. We understand that RockHill has performed some recent cleaning trials with a pumice stone to remove streaking and staining of the glass. RockHill reported that the streaking at the windows reappeared within one week.

Based on documents and reports provided to WJE In 2015, recommendations by others included removal of atmospheric soil and dirt with Hard Water Stain Remover as manufactured by Bio-Clean Products of Sacramento, California and restoration of the anodized aluminum finish by applying Metal ReSurfacer

followed by Metal Protector HD as manufactured by Presto Restoration Products, Inc. of Atlanta, Georgia. WJE was provided a copy of recommendations by Righter Group, Inc. for the application of a Tnemec coating to the aluminum to prevent corrosion of the aluminum.

The aluminum at 100 Summer Street is anodized. The anodizing finish process induces a protective surface oxide film. This allows for integral colors that weather with the anodized film. Unless anodized aluminum is exposed to concentrated or uneven concentrations of acids or alkalis or localized contaminants like oils or plasticizers from silicone sealants, the weathering process is typically even for finish elements of the same shape and exposure to weather. Facade components protected from the elements will weather differently than those exposed to the elements.

Pitting of the aluminum from corrosion, oils, plasticizers, or other contaminants may attract and retain atmospheric dirt which can be carried away and redistributed on the facade during rain events. In general, aluminum cladding should be cleaned on a regular but less frequent basis than glass. As the anodized finish ages, further considerations can be made to address the aesthetic appearance of the cladding system.

## SCOPE OF SERVICES

We recommend the following scope of services to evaluate the cause of discoloration and streaking of the aluminum panels and window glass, establish cleaning trials, and develop cleaning recommendations. The scope of services is organized by task.

**Document Review.** WJE will review relevant documentation provided to WJE related to original construction drawings of the curtain wall, window cleaning frequency, chemicals utilized during window cleaning, product data, and previous recommendations by others to clean and coat the anodized aluminum. We will also review any other data related to modifications to the glass and aluminum curtain wall including, but not limited to, sealant joint and glazing replacement/repairs and the pre-formed silicone joint seals that were added over metal-to-metal joints at aluminum column covers.

**Condition Survey, Field Microscopy, and Sample Collection.** WJE will conduct a visual condition survey from grade to document severity and pattern of discoloration and streaking by elevation and floor levels. We will also perform field microscopy of the anodized finish and glass at grade level and at the various roof levels to determine and identify evidence of plasticizer migration from silicone sealants. The field microscopy will allow us to determine a baseline at cleaning trial locations of the conditions prior to cleaning. WJE will attempt to collect samples from curtain wall and panel sealants and components from streaking areas on the panels. To do so, WJE anticipates using various solvents to swab areas of the streaks to collect material for laboratory analysis. We anticipate that this field work can be completed in two days with two to three people.

Depending on conditions observed, WJE may recommend removing small diameter (approximately 2 inches) coupons from the panels at areas of streaks and where streaking is not observed. These coupons would be analyzed using a Scanning Electron Microscopy (SEM) to study the condition and thickness of the anodizing layers. Location of the coupon removal would be coordinated with RockHill. Temporary weather protection would be installed at areas where the coupons are removed. This work may require

contractor assistance. We have provided a separate line item budget amount for coupon sampling and SEM in the proposed fee table.

**Laboratory Analysis.** WJE will conduct laboratory testing of the samples collected during the condition survey with the intent of identifying components of the material(s) producing streaks as well as possible source(s) of these components.

General compositional analysis of the residues from streaked, non-streaked, and sealant materials will be conducted using fourier transform infrared (FTIR) spectroscopy and energy dispersive x-ray spectroscopy via scanning electron microscopy (SEM/EDS). FTIR is suitable for analyzing and identifying any organic components unknown samples of relatively high purity (1 or 2 components), which is generally the case for migrating staining materials. SEM/EDS is suitable for identifying the elemental composition of inorganic components. This proposal includes up to four samples tested (extracts of streaked and unstreaked areas, using both water and a suitable solvent for the extraction, and sealants), data analysis and a laboratory report. In the event that FTIR proves unsuitable for analysis of the extracts, analysis may be conducted by either x-ray diffraction (XRD) or gas chromatography with mass spectrometry (GC/MS). XRD is suitable for analyzing crystalline components, such as salts, and is particularly useful for determining the identity of non-carbon containing (i.e., inorganic) compounds. For purposes of this proposal we have assumed that up to two samples (in the event that water extracts are inorganic/crystalline) will be evaluated by XRD and those samples would replace two of the FTIR/SEM/EDS sample evaluations. GC/MS separates and identifies individual chemical constituents and is most suitable for analysis of materials consisting of several different chemical compounds or for identifying trace composition differences between samples. For the purpose of this proposal, we have assumed up to two samples tested (streaked and non-streaked areas) by GC/MS. This testing will only be undertaken if FTIR/SEM/EDS/XRD is not suitable to identify the extract. Following the identification of the compounds present in the streaking material, further research and testing of adjacent materials of the facade system may be warranted to identify and confirm the source of the streaks.

**Cleaning Trials.** WJE will direct in-house building maintenance personnel to perform various cleaning trials (less than 1 square foot each) to remove dirt, pollutants, and plasticizers (if present) at trial locations identified during the condition survey. The goal of the cleaning trials will be to remove these materials without damaging the anodized finish. Cleaning solutions and methods will be informed by findings from the laboratory analysis. Field microscopy will be completed after the cleaning trials to compare the results to the pre-cleaning condition and to determine the effectiveness of the cleaning and aesthetics in the near term. Our budget includes two people for one day to perform the initial trial and one day to return to the site approximately one-week after the trials to evaluate the effectiveness of the cleaning. Our budget for cleaning trials does not include contractor assistance. However, if requested by RockHill, WJE will coordinate contractor assistance as a reimbursable outside service subject to our standard ten-percent mark-up.

**Report of Findings and Recommendations.** At the completion of the condition survey, laboratory analysis, and cleaning trials, WJE will provide an illustrated report of our findings and recommendations for cleaning options. We understand that RockHill is considering developing a cleaning project for

bidding later this fall and for work to be completed in 2022. Our recommendations will take into consideration RockHill's stated goal to improve the curb appeal of the building facades.

### Additional Services

**Preliminary Pricing - Drawings and Specifications.** Based on findings from the cleaning trials and your review of our recommendations, and as an additional service, WJE is available to provide technical specifications and elevation drawings indicating areas of facade cleaning as determined by RockHill. Our budget includes the preparation of two technical specifications and schematic elevation drawings for each elevation indicating areas of work to be completed. These documents would be developed so that RockHill could receive preliminary pricing by contractors and would not be intended for construction.

**Bidding and Construction - Drawings and Specifications.** WJE is available to further develop the pricing drawings and specifications into bidding and contract documents for the facade. WJE will assist RockHill in soliciting and reviewing bids from up to three qualified contractors.

**Construction Period Services**. WJE is available to complete site visits to monitor the cleaning process during the repair phase. The primary purpose of the site visits will be to verify that methods and procedures used to clean the facade continue to be effective and executed according to the specifications. Observations will be presented in weekly site visit reports. WJE would notify RockHill immediately should problematic conditions be observed that impact a change to the cleaning scope of the work. WJE will also attend regular project meetings with RockHill and contractors as well as review and respond to submittals, and requests for information (RFIs).The professional services performed by WJE are intended to supplement, rather than replace, the quality assurance and quality control work carried out by the construction team of this project. Once a construction schedule is available from the selected contractor, WJE will provide a budget for construction period services.

## SCHEDULE AND FEE

Upon notice to proceed, document review can commence within three weeks. The condition survey will be scheduled, sample collection and field microscopy will be scheduled for two days in early September 2021 (weather permitting). The laboratory analysis will be completed over two to three weeks following sample collection. The cleaning trials are weather dependent requiring temperatures above 40 degrees and will follow completion of the laboratory analysis of samples. The cleaning trials will be scheduled no later than mid-October, weather permitting. If we receive notice to proceed by August 1, we anticipate that the work outlined in this proposal will be completed by late November. If RockHill requests any of the additional services described above, in general this work would follow the base scope. Pricing documents could be prepared by the end of the year and bidding and construction documents could be completed to issue to contractors by February 2022. WJE would prepare elevation drawings while the laboratory analysis and cleaning trials are being performed and prepare technical specifications based on the outcome of the cleaning trials.

Based on our understanding of the project, WJE will perform the above scope of services as fixed fee as outlined in the table below.

WJE



## Base Scope Fees

| Tasks | Fee |
|---|---|
| Document Review | [redacted] |
| Condition Survey, Field Microscopy, and Sample Collection | |
| Laboratory Analysis | |
| Cleaning Trials | |
| Report | |
| **Total** | |

## Additional Services – Budget

| | |
|---|---|
| Laboratory Analysis – Additional Sample Testing | |
| FTIR/SEM/EDS | [redacted] |
| XRD | |
| GC/MS | |
| Preliminary Pricing - Drawing and Specifications | |
| Bidding and Construction - Drawings and Specifications. | |
| Construction Period Services | *TBD based on construction schedule* |

WJE will invoice a portion of the fees each month. All additional services will be billed monthly on a time and expense basis in accordance with the attached *Terms and Conditions for Professional Services*. Customary reimbursable expenses such as photography, postage, contractor assistance, and travel are included in the lump sum budget schedule below. Please note that fees may be reallocated within work scope items depending on extent of review and required involvement for each phase, system, or item. WJE will not exceed the total budget amount without written approval from RockHill.

## Closing

Thank you for considering WJE for this assignment. We appreciate the opportunity to continue working with Rockhill. If this proposal is acceptable to you, please return a signed copy as authorization to proceed. If you require any modifications to this document, we would be pleased to consider those changes and revise our scope of services accordingly.

WJE



Sincerely,

**WISS, JANNEY, ELSTNER ASSOCIATES, INC.**

Tara Ikenouye, AIA
Senior Associate, Project Manager

**Agreed and approved** (2021.4413)

Name: ____________________________ (please print)

Signature: _____________________________________

Title: __________________________________________

As Agent or Principal for: ________________________

Date: __________________________________________

WJE

**Terms and Conditions for Professional Services**



**Wiss, Janney, Elstner Associates, Inc.** or **WJE Engineers & Architects, P.C. (WJE)** has been requested to perform certain professional and other services. The parties agree that these services shall be performed under the following Terms and Conditions, and that Client's acceptance of WJE's proposal or its direction for WJE to commence any services constitutes acceptance of these Terms.

**1. Independent Contractor.** WJE is an independent contractor, and all persons employed to furnish services hereunder are employees of WJE or its subcontractors/subconsultants and not of the Client. WJE and Client agree to be solely responsible for compliance with all federal, state, and local laws, rules and regulations, and ordinances that apply to their own respective employees.

**2. Performance.** The standard of care for all professional services performed or furnished by WJE will be the skill and care ordinarily used by members of WJE's professions performing similar services and practicing under similar circumstances at the same time and in the same locality. WJE makes no guarantees or warranties, express or implied, with regard to the performance of its services. WJE shall not have control over or be in charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures or for construction safety precautions and programs since these are the responsibilities of others. WJE agrees to perform its services in as timely a manner as is consistent with the professional standard of care and to comply with applicable laws, regulations, codes and standards that relate to WJE's services and that are in effect as of the date when the services are provided. Client agrees that no claim may be brought against any WJE employee individually for any claim involving performance of services.

**3. Client Duties.** In order for WJE to perform the services requested, the Client shall, at no expense to WJE, (1) provide all necessary information regarding Client's requirements as necessary for the orderly progress of the work; (2) designate a person to act as Client's representative for the services who shall have the authority to transmit instructions, receive instructions and information, and interpret and define Client's policies and requests for WJE's services; and (3) provide access to and make all provisions for WJE to enter, without cost, limitation, or burden to WJE, the specific property as required to perform the work, including the use of scaffolds or similar mechanical equipment. WJE is entitled to rely upon the information and services provided by the Client.

**4. Safety.** Field work will be performed only under conditions deemed safe by WJE personnel. Charges may be made for safety or security measures required by hazardous job conditions that WJE may encounter. Client understands that WJE is only responsible for the safety of its own employees and those of its subconsultants and is not responsible for the safety of other persons or property.

**5. Compensation and Expenses.** Client agrees to pay for WJE's requested services in accordance with WJE's standard hourly rate schedule or negotiated fee. Charges generally will be billed in monthly intervals with applicable taxes included. Travel, subsistence, and expenses incurred; communications; reproduction; and shipping charges will be billed at cost plus 5 percent and invoiced as an expense service fee. Use of vehicles will be billed at $0.60 per mile. Expended materials for field and laboratory work, rental equipment, and any fees advanced on Client's behalf will be billed at cost plus 10 percent and invoiced as an expense service fee. WJE equipment used in field or laboratory work is billed at WJE's equipment usage rate schedule in effect at the time the work is performed, subject to adjustment for minimum or extended usage. Portal-to-portal equipment usage rates are comparable to prevailing commercial rental rates (if available). Billing rates may be increased annually. Any subcontracted service will be billed at cost plus 10 percent providing the subcontract firm has in place adequate insurance coverage determined by WJE; otherwise, the cost will be marked up 20 percent and invoiced as an expense service fee. Client agrees to pay WJE's then-current time charges, attorneys' fees, and other expenses resulting from required attendance at depositions, administrative proceedings, or responding to subpoenas or court orders relating to the Project, but not for such expenses attributed to WJE's negligent performance of its services.

Payment for WJE's services is expected in full in US dollars upon receipt of the invoice. Invoices more than 30 days past due are subject to a 2% interest charge per month (but no more than the maximum extent allowed by law) compounded annually and any related attorneys' fees and collection expenses. WJE reserves the right to suspend its services if the Client fails to make payment when due. In such an event, WJE shall have no liability to the Client for delay or damage caused the Client because of such suspension.

**6. Termination.** Both the Client and WJE have the right to terminate WJE's services for convenience upon seven calendar days' written notice to the other party. In the event the Client terminates without cause, WJE shall be entitled to compensation for its services and expenses up to the time of such notification, including fees for any transition services, and shall have no liability for delay or damage to Client because of such termination.

**7. Reports, Drawings, and Work Product.** WJE retains ownership of reports, drawings, specifications, test data, techniques, photographs, letters, notes, and other work product, including those in electronic form, it has created. These documents or parts thereof may not be reproduced or used by the Client for any purpose other than the purpose for which they were prepared, including, but not limited to, use on other projects or future modifications to this Project, without the prior written consent of WJE. Upon request, WJE will provide Client with a copy of documentation for information and reference purposes and bill for such reproduction in accordance with Paragraph 5 above. Any unauthorized use of WJE's work product shall be at the Client's sole risk and Client shall indemnify WJE for any liability or legal exposure to WJE. To the extent WJE terminates its services due to non-payment of fees by Client, Client shall not be entitled to use the documents described herein for any purpose whatsoever.

**8. Environmental Hazards.** Client acknowledges that WJE's services do not include the detection, investigation, evaluation, or abatement of environmental conditions that WJE may encounter, such as mold, lead, asbestos, PCBs, hazardous substances, or toxic materials that may be present in buildings and structures involved in this Project. The Client agrees to defend, indemnify, and hold WJE harmless from any claims relating to the actual or alleged

existence or discharge of such materials through no fault of WJE's employees. WJE reserves the right to suspend its services, without liability for consequential or any other damages, if it has reason to believe that its employees may be exposed to hazardous materials and will notify the Client in such event.

**9. Dispute Resolution.** Prior to the initiation of any legal proceedings (except for WJE initiated claims for nonpayment for services), WJE and the Client agree to submit all claims, disputes, or controversies arising out of or in relation to the services provided by WJE to mediation. Such mediation shall be conducted under the auspices of the American Arbitration Association or such other mediation service or mediator upon which the parties agree. Client consents to suit for nonpayment in the state courts of Illinois.

**10. Successors and Assigns.** These Terms shall be binding upon Client and WJE and their respective successors, assigns and legal representatives. Neither party may assign, subcontract, or otherwise delegate its responsibilities without the prior consent of the other party, which consent shall not be unreasonably withheld. Additionally, in no instance shall this paragraph be interpreted to create any rights in any third party.

**11. Insurance.** WJE maintains commercial general liability, automobile, workers' compensation, and employers' liability and professional liability coverages under policies written by national insurance carriers rated by the A.M. Best Company, evidence of which will be provided upon request. Special endorsements are not allowed. No waiver of subrogation is allowed on WJE's professional liability policy. Upon written request, WJE agrees to name the Client as an additional insured to the commercial general liability and automobile coverages. Any request to add other parties as additional insureds must be made in writing and is subject to certain limitations. All policies are subject to annual renewal. Excess coverage is available for exposures over primary policy limits except for professional liability.

**12. Indemnity.** To the fullest extent permitted by law, Client and WJE each agree to indemnify and hold the other harmless, and their respective agents, officers and employees, from and against liability for all direct claims, losses, damages, and expenses, including reasonable attorneys' fees, to the extent such claims, losses, damages, or expenses are for bodily injury, sickness, disease, death, or property damage and to the extent they are caused by the negligent acts, errors, or omissions of the indemnifying party, and/or the indemnifying party's agents, officers, employees, independent contractors, or subcontractors of any tier. In the event such claims, losses, damages, or expenses are caused by the joint or concurrent negligence of Client and WJE, or their respective agents, officers, employees, independent contractors, or subcontractors of any tier, they shall be borne by each party in proportion to that negligence.

**13. Agreed Remedy.** To the fullest extent permitted by law, the total liability, in the aggregate, of WJE and WJE's officers, directors, employees, agents, and consultants to Client and anyone claiming by, through, or under Client, for any and all injuries, claims, losses, expenses, or damages, including, without limitation, attorneys' fees, arising out of or in any way related to WJE's services, the Project, or these Terms, from any cause or causes whatsoever, including but not limited to, negligence, strict liability, indemnity or breach of contract shall not exceed an amount equal to the proceeds obligated to be paid under WJE's applicable insurance policy for such claims. If, for any reason, the applicable insurance policy does not provide coverage for any particular claim described herein, then the liability amount shall not exceed WJE's fees for the services performed hereunder.

In no event shall WJE be liable in contract, tort, strict liability, warranty or otherwise, for any special, incidental or consequential damages, such as, but not limited to, delay, disruption, loss of product, loss of anticipated profits or revenue, loss of use of equipment or system, non-operation or increased expense of operation of other equipment or systems, cost of capital, or cost of purchase or replacement equipment systems or power.

**14. Third-Party Beneficiaries.** Nothing contained in these Terms shall create a contractual relationship with, or a cause of action in favor of, a third party against either the Client or WJE. WJE's services hereunder are being performed solely for the benefit of the Client, and no other entity shall have any claim against WJE because of these Terms or WJE's performance or non-performance of services hereunder.

**15. Laboratory or Material Testing Services.** Material samples not consumed in WJE's work will be discarded 60 days after completion of the project unless the Client requests other disposition in writing. WJE cannot be responsible for material after 60 days and Client shall inform WJE in writing how to dispose of the samples. WJE will exercise reasonable care in safeguarding materials, records, or equipment, but disclaims any liability for loss or damage. Rates for sample storage will vary by sample size but in no event will sample charges be less than $270 per year accruing upon the 61st day of storage and annually thereafter. Failure to pay for underlying services or storage constitutes permission to dispose of all samples held by WJE.

Any testing done on materials or products shall not prevent WJE from any services involving Client's materials or products in the built world. WJE shall have no liability to third parties for any products or materials developed from WJE's services. WJE's reports, trademarks or other property shall not be used to indicate endorsement of any material or product.

**16. Entire Agreement.** These Terms together with any written proposal shall constitute the entire understanding of the parties concerning the Project and supersede all prior negotiations and written agreements between them, and any amendment or modification to either WJE's proposal or these Terms may be made only by a written instrument expressly stated to be an amendment and signed by WJE.

**17. Severability.** If any provisions of these Terms, or portions thereof, are determined to be unenforceable, the remainder shall not be affected thereby and each remaining provision or portion thereof shall continue to be valid and effective and shall be enforceable to the fullest extent permitted by law.

Copyright 2017 Wiss, Janney, Elstner Associates, Inc.

# EXHIBIT B

# SERVICE AGREEMENT

**Description (including address) of property:**

100 Summer Street
Boston, MA 02110
(hereinafter "**Property**")

**Owner:** 100 Summer Owner LLC
500 Boylston Street, Suite 2100
Boston, MA 02116
Attention: Joseph Goldman
(hereinafter "**Owner"**)

**Property Manager:** Rockhill Management, L.L.C.
100 Summer Street, 32nd Floor
Boston, MA 02110
Attention: Property Manager
(hereinafter "**Manager**")

**Contractor:** Sky Safety, Inc.
1218 Bennington Street
East Boston, MA 02128
Attention: Bianca Bertoncini
(hereinafter "**Contractor**"),

**Contractor's Federal Tax ID Number:** #______________________

**Services:** To provide window cleaning services as more particularly described in Exhibit A attached hereto (hereinafter "**Services**") to be provided by Contractor in accordance with the terms hereof.

**Term of Contract:** From 01/01/2023 to 12/31/2023, subject to termination and the other provisions hereof (the "**Term**").

**Contract Payment Terms:** $36,800.00 in arrears payable against invoice therefor, or as otherwise set forth on Exhibit B annexed hereto and made a part hereof.

**SERVICE CONTRACT TERMS**

1. **SERVICES.** Contractor agrees to perform for the term specified, the Services listed on Exhibit A attached hereto and made a part hereof. Exhibit A is being attached solely for the limited purpose of describing the parties understanding of the scope of the Services to be performed by Contractor. All operational logs and records relating to the Services prepared and/or maintained by Contractor or in the custody of Contractor shall not be destroyed without the prior written consent of Owner or Manager and shall be returned to either Owner or Manager at the expiration of the Term. Contractor agrees to furnish at its expense all labor, supplies, uniforms, equipment and materials necessary to properly perform the Services. Contractor shall permit and facilitate inspection of the Services by Owner and its representatives (including, but not limited to, Manager) and public authorities at all times. Failure of Manager or Owner during the Term of this Agreement to discover or reject unacceptable Services, or Services not performed in accordance with this Agreement, shall not be deemed an acceptance thereof nor a waiver of Owner's right to the proper execution of the Services or any part thereof by Contractor. In no event shall Contractor's liability, for any and all damages, claims or expenses, be limited by the language of any attachment to this Agreement. The provisions of this Agreement shall control in the event of any conflict between the terms of any attachment hereto and this Agreement. Upon payment for services rendered, Owner shall have all rights of ownership for any work product produced under this Agreement.

2. **PERMITS, LICENSES.** If any government permit, license or authorization shall be required or necessary for the proper and lawful performance of the Services hereunder or if the failure to secure such license, permit or authorization would, in any way, affect the Property, Manager or Owner, then Contractor, at Contractor's expense, shall duly procure and thereafter maintain such license, permit or authorization and submit the same to Owner for inspection, if requested. Contractor, at Contractor's expense, shall at all times, comply with the terms and conditions of each such license, permit and authorization and shall notify Owner immediately should any such license, permit or authorization no longer be in effect or in good standing.

3. **WAIVER OF TRIAL BY JURY**. The parties hereto shall and they hereby do waive, where permitted by law, trial by jury in any action, proceeding or counterclaim brought by any of the parties hereto against the other in any matters whatsoever arising out of, or in any way connected with, this Agreement.

4. **NON-WAIVER PROVISIONS.** The failure of Manager or Owner to insist in any one or more instances upon the strict performance of any of the covenants, terms, provisions or conditions of this Agreement or to exercise any election herein contained shall not be construed as a waiver or a relinquishment for the future of such covenant, term, provision, condition or election, but the same shall continue and remain and be in full force and effect. No waiver by Manager or Owner of any covenant, term, provision or condition of this Agreement shall be deemed to have been made unless expressed in writing and signed by Owner.

5. **LABOR HARMONY.** Contractor agrees that it will not at any time prior to or during the Term of this Agreement, either directly or indirectly, use any subcontractors and/or labor and/or materials which would or will create any difficulty with other contractors and/or subcontractors and/or labor engaged by Contractor, Manager, Owner or others in the construction, repair, improvement, maintenance and/or operation of the Property or any part thereof. Contractor agrees to notify Manager and Owner promptly of any events Contractor believes may result in a work stoppage, slowdown, labor dispute, strike or other labor related disruption. Contractor agrees to work in harmony with all contractors and laborers employed by Manager, Owner or others in connection with the Property. In the event of any work-stoppage or other disruption which involves the participation of Contractor's personnel whether as a result of a dispute with Contractor or due to third party actions involving informational or organizational picketing or picketing by any labor organization against any other employer, Contractor agrees to take appropriate and prompt action to provide qualified personnel to perform the Services and to minimize any delay in performing the Services by fully cooperating in obtaining injunctions, presentation of facts, furnishing of witnesses and assisting in every reasonable way to eliminate any work-stoppage or other disruption or the effect of any work-stoppage or other disruption, or to follow such

other directions as Owner shall issue. Should Contractor fail to comply with this provision, Owner shall have the right, upon written notice to Contractor, to terminate this Agreement without any liability to Contractor.

6. **ASSIGNMENT BY CONTRACTOR.** Contractor shall not assign this Agreement nor any interest therein without the prior written consent of Owner, which consent may be withheld at Owner's sole and absolute discretion. The transfer of a majority interest of the voting stock or general partnership interests in Contractor shall be deemed an assignment of this Agreement by Contractor. Any attempted assignment of this Agreement or any interest therein without the prior written consent of Owner shall be null and void. Manager is a third-party beneficiary of this Agreement.

7. **SUBCONTRACTING.** Contractor may only sub-contract with the prior written consent of Owner, which consent may be withheld at Owner's sole and absolute discretion. Every subcontract must provide that the same is subject to all of the covenants, terms, provisions and conditions of this Agreement and must provide that in the event of termination or cancellation of this Agreement for any reason whatsoever, prior to the expiration of such subcontract, the subcontract will automatically terminate on the same date this Agreement is terminated or canceled.

8. **ADDITIONAL DEFINITIONS.** It is understood that wherever the terms "adequate" or "as required" or "as necessary" or "if necessary" are stated in this Agreement (including any Schedule attached hereto), these terms shall be construed to mean "as determined by Owner".

9. **DISCHARGE OF EMPLOYEES.** Owner and/or Manager shall have the right at any time, and at their sole discretion, to recommend that Contractor remove any employee of Contractor who is objectionable to Owner and/or Manager from employment at the Property and Contractor shall promptly after demand by Manager or Owner, discharge or transfer from the Property such employee of Contractor, provided, however, that if the effectuating of such discharge or transfer is limited by the contract between Contractor and the employee's union, Contractor agrees to use its best efforts within the limits of such union contract to effectuate such discharge or transfer as promptly as possible.

10. **MECHANIC'S LIENS.** Contractor agrees that if any mechanic's lien is filed against the Property for work done, services claimed to have been rendered or materials claimed to have been furnished in connection with or pursuant to any of the provisions of this Agreement, then Contractor shall cause such mechanic's lien to be discharged within ten (10) days after filing, at Contractor's expense, by: i) filing the bond required by law; or ii) providing Owner with a copy of the court order discharging such lien. Contractor will defend, indemnify and hold harmless the Manager, Owner, and their respective shareholders, stockholders, officers, directors, principals, partners, beneficiaries, subsidiaries, employees and Affiliates (hereinafter defined), and their respective heirs, successors and assigns (the foregoing parties referred to collectively herein as the "**Indemnified Parties**") any and all damages, liabilities, costs and expenses (including attorneys' fees) suffered or incurred by such parties as a result of Contractor's failure to comply with this provision. Upon Contractor's failure to comply herewith, the lien may be bonded or discharged by Manager or Owner at Contractor's sole expense. Contractor shall, upon demand, reimburse Owner for all costs incurred in connection with any such action by Owner, including, without limitation, reasonable attorneys' fees and costs incurred in connection therewith. Contractor's liability under this Section shall survive the expiration or termination of this Agreement, but this shall not be construed to mean that Contractor's liability does not survive as to other provisions of this Agreement.

11. **NON-INTERFERENCE.** Contractor shall perform the Services so as not to unreasonably interfere with Manager's or Owner's operation of the Property or the business operations of any tenant or other occupant of the Property.

12. **CONTRACTOR RESPONSIBILITY.** Contractor shall be responsible to Manager and Owner for the acts and omissions of Contractor's suppliers, agents, employees and subcontractors. All contracts entered into by Contractor with any subcontractors shall require the subcontractors to be responsible for the acts and omissions of their agents and employees and compliance with the provisions of this Agreement

to the extent applicable to the subcontractor's portion of the Services. Personnel supplied by Contractor or any subcontractor will be deemed employees of Contractor or the subcontractor, as the case may be, and will not for any purpose be considered employees or agents of Manager or Owner. Contractor assumes full responsibility for the actions of such personnel while performing Services pursuant to this Agreement, and shall be solely responsible for their supervision, daily direction and control, payment of salary or equivalent (including, withholding of income taxes, stock options, contributions to pension or similar retirement programs, overtime pay, education programs, awards, special recognition events and social security contributions), worker's compensation, disability benefits, social security taxes, unemployment insurance and the like. Contractor shall not discriminate against any employee or applicant for employment because of race, color, religion, gender, sexual orientation, age, disability or national origin. Contractor warrants that it is and throughout the Term of this Agreement will continue to be in full compliance with all Equal Employment Opportunity (E.E.O.) provisions as required by law, regulation or executive order, specifically including but not limited to, the provisions of executive order 11246 of September 24, 1965 as amended. If applicable, Contractor also agrees to execute and to keep in full force and effect throughout the Term of this Agreement a Compliance Undertaking Standard Form 100 (Equal Employment Opportunity Employer Information Report E.E.O.-1).

13. **MAINTENANCE OF RECORDS.** Contractor shall maintain written records in accordance with generally accepted accounting procedures showing in detail all costs which it incurs and payments which it receives in the performance of this Agreement. Such records shall include, but shall not be limited to, payroll records, job cards, attendance cards and job summaries and shall be subject to audit and inspection by Manager and Owner during the Term of this Agreement and for seven (7) years after its expiration or earlier termination, unless a longer period is required by law. Contractor agrees that if work and materials to be furnished by Contractor hereunder are for a building in which an office of the United States of America as a tenant is located, and if this Agreement is for an amount exceeding $2,500, Contractor shall permit the Controller General of the United States or any of his or her duly authorized representatives to have access to, and the right to examine any directly pertinent books, documents, papers and records pertaining to this Agreement until the expiration of three (3) years after final payment of any monies has been made pursuant to the provisions of this Agreement.

14. **COMPLIANCE WITH LAWS AND POLICIES.** Contractor shall at all times comply with all applicable federal, state and local laws, codes, ordinances, rules and legal requirements affecting the Services, as well as Manager's and Owner's directives, guidelines, procedures, rules, regulations and the like which are furnished to Contractor.

15. **TRADEMARK AND PUBLICITY.** Contractor shall have no right to use either Manager's or Owner's trademark or trade name, the Property name or any image thereof or to refer to this Agreement or the Services performed hereunder directly or indirectly in connection with any product, promotion, advertisement or publication, or the like, without Owner's prior written approval, as appropriate, which approval may be withheld at Owner's sole discretion.

16. **ETHICAL STANDARDS.** Contractor agrees that it will not make or confer, or offer to make or confer, any payment to or benefit upon any third party (including, without limitation, any government agency or instrumentality thereof) with the intent to influence the conduct of such third person regarding this Agreement or the business affairs of any of the parties to this Agreement or of the third party. Contractor shall not give or offer gifts or gratuities of any type or offer trade discounts not available to the general public, to Manager's or Owner's employees or members of their families. Violation of this provision by anyone employed or retained by Contractor, or by Contractor itself, shall constitute a default under this Agreement by Contractor.

17. **PREVAILING PARTY.** In any action or proceeding commenced by any party against the other party in connection with this Agreement, the losing party shall reimburse the prevailing party for the reasonable attorneys' fees and disbursements incurred by the prevailing party in prosecuting or defending said action or proceeding.

18. **Intentionally omitted**.

19. **LIMITATION ON LIABILITY.** No general or limited partner in or of Owner or Manager, whether direct or indirect, or any direct or indirect partners in such partners or any disclosed or undisclosed officers, shareholders, principals, directors, employees, members, partners, servants or agents of Owner or Manager shall be personally liable under this Agreement. The liability of Owner (including any assignee or successor of Owner) for shall be limited to Owner's interest in the Property. In the event this Contract is executed by Manager on behalf of Owner, Contractor acknowledges and agrees that Manager is executing this Contract in its capacity as Owner's agent and that Manager shall have no liability or obligation to Contractor under this Agreement. In no event shall either party be liable to the other for any indirect, speculative, special, consequential, or punitive damages arising out of this Agreement.

20. **INDEPENDENT CONTRACTOR.** Owner hereby engages Contractor to perform, as an independent contractor, the Services set forth in this Agreement. Nothing contained herein shall be deemed or construed to create any association, partnership, joint venture or relationship of principal and agent or master and servant or employer and employee between the parties hereto or any Affiliates or subsidiaries thereof, or to provide either party with the right, power or authority whether expressed or implied, to create any duty or obligation on behalf of the other party or to bind the other party by virtue of this Agreement, except as expressly provided in this Agreement.

Contractor shall be responsible for the safety of its own employees. Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Services, including safety of all persons and property during performance of the Services. This requirement will apply continuously and will not be limited to working hours.

Contractor warrants that it has reviewed and inspected the site of the Property, and that it has satisfied itself as to the local conditions and special requirements related to the site, and any other characteristics that are relevant to, or impact upon, the performance of the Services.

21. **TERMINATION.**

(a) Owner shall have the right, in its sole and absolute discretion and without payment of any penalty, premium or termination fee, to terminate this Agreement in whole or in part at any time during the Term hereof upon thirty (30) days prior written notice to Contractor. Notwithstanding anything to the contrary set forth herein, in no event shall the Term of this Agreement exceed one (1) year, nor shall the Term of this Agreement automatically extend or renew.

(b) If Contractor shall default in the performance of any of its obligations under this Agreement, or commits a criminal act in connection with its provision of the Services hereunder, then Manager and Owner shall each have the right, without payment of any penalty, to terminate this Agreement in whole or in part immediately upon written notice to Contractor.

(c) If a receiver, liquidator or trustee for Contractor shall be appointed by court order; or a petition shall be filed against Contractor under any bankruptcy, reorganization or insolvency law; or Contractor shall file a petition in voluntary bankruptcy or shall request reorganization under any provision of voluntary bankruptcy, reorganization or insolvency laws; or if Contractor shall make an assignment for the benefit of creditors, then this entire Agreement shall immediately terminate upon the happening of any such event.

(d) Owner shall have the right, in its sole and absolute discretion and without payment of any penalty, to terminate this Agreement (i) as set forth in Section 31 below, and (ii) immediately upon the sale of the Property or Owner's interest therein.

22. **INDEMNIFICATION.** Contractor shall, to the fullest extent permitted by law, indemnify, defend and hold harmless the Indemnified Parties from and against any and all liability, claims, demands, losses, damages, actions, costs and expenses (including attorneys' fees and investigation costs), payments, recoveries and judgments arising out of, in connection with, or caused in any manner by (i) the acts or omissions of the Contractor, and its directors, officers, employees, contractors, subcontractors and agents, which constitute negligence, fraud, breach of this Agreement, breach of fiduciary duty, willful, reckless or criminal misconduct or any actions of Contractor

beyond the scope of authority conferred upon Contractor pursuant to the terms of this Agreement or (ii) the performance or failure to perform any Services under this Agreement or (iii) the breach of any representation or warranty, or any provision or obligation, set forth herein by Contractor, or Contractor's employees or agents or subcontractors, excepting only liability arising from the sole negligence or willful misconduct of Owner or Manager. Contractor shall, at its own expense, defend any and all actions brought against the Indemnified Parties based upon any of the foregoing and shall pay all attorneys' fees and all other expenses, and promptly discharge any judgments, settlements or compromises arising therefrom. Contractor's liability under this Section shall survive the expiration or termination of this Agreement, but this shall not be construed to mean that Contractor's liability does not survive as to other provisions of this Agreement. For purposes of this Agreement, "Affiliates" shall mean any Person, any relative of the Person in question, if such Person is an individual, or any other Person directly or indirectly through one or more intermediaries is Controlled by, Controlling or under common Control with the Person in question. For purposes of this Agreement, "Person" means any individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or its agency or instrumentality.

23. **<u>COMPENSATION</u>.**

(a) In consideration for all of the Services to be rendered by Contractor hereunder, Contractor shall be paid, subject to the provisions of this Agreement, the compensation set forth on the cover page hereof or any Exhibit referred to thereon.

(b) Undisputed payment for services performed shall be made once a month, in arrears.

(c) Contractor agrees that Manager is acting only as the property manager of the Property, is not a party to this Agreement and has no liability or obligation to Contractor hereunder.

24. **<u>STANDARD OF OPERATIONS</u>.** Contractor shall perform the Services in an efficient, lawful and appropriate manner appropriate to the nature of the Property and in accordance with Owner's and/or Manager's instructions and Contractor shall perform the Services hereunder at all times with due care and in accordance with standards for similar services prevailing nationally.

25. **<u>Intentionally omitted.</u>**

26. **<u>SERVICES GUARANTEE</u>.** Contractor agrees to perform all Services in a good, timely and workmanlike manner acceptable to Owner. Contractor unconditionally guarantees all materials, equipment and labor provided under this Agreement for one (1) year after date of final payment to Contractor hereunder or the date of final acceptance of the Services, whichever date is later and shall repair or replace within said period, at its sole cost and expense, any labor, materials or equipment provided or furnished under this Agreement that is damaged, defective or not satisfactory. Contractor shall make or commence to make, within three (3) days of its receipt of written notice from Manager or Owner during the guaranty period, any and all repairs or replacements, without cost to and to the satisfaction of Manager or Owner. If Manager or Owner determine that an emergency exists which requires more immediate action than Contractor is able to provide, Manager or Owner may, without sending any notice to Contractor, perform or cause to be performed such repairs or replacements that Contractor is required to make pursuant to this provision, in which event Contractor shall compensate Owner for the cost thereof not later than ten (10) business days after receipt of written demand therefor. Any repairs or replacements that Contractor is required to make pursuant to this provision shall be prosecuted to completion by Contractor even if such repairs or replacements may not be completed until after the expiration of the guaranty period. The obligations of Contractor to make repairs or replacements under this provision shall not be satisfied, unless the Owner so elects, by the payment of money to the Owner. If Manager or Owner determine in their sole and absolute discretion that any labor furnished or materials or equipment installed under this Agreement are inherently defective, thus being incapable of repair, then Contractor shall, upon notification by Manager or Owner of such a determination, provide a replacement for said labor, materials or equipment. In the event that Contractor fails to comply with this provision, the Owner may, in addition to exercising all other legal and equitable remedies it may have, (1) deduct from any payment due or thereafter to become due to

Contractor under this Agreement, the amount of damage, cost or expense caused by said failure by the Contractor, and (2) perform or cause to be performed any needed repairs and replacements, in which event Contractor shall compensate the Owner for the cost thereof. The foregoing Guarantee is in addition and supplementary to any other guarantee which may be provided by Contractor. Warranties and guarantees issued by manufacturers of materials or equipment furnished by Contractor under this Agreement shall not in any way serve to limit the obligations of Contractor under this provision. Notwithstanding the foregoing sentence, any such warranties or guaranties shall inure to the benefit of Manager and Owner, their successors and assigns, and Contractor shall, to the extent possible, assign such warranties and guaranties to Owner.

27. **ACTS BEYOND REASONABLE CONTROL.** No party shall be considered in default of any of its obligations under this Agreement to the extent that performance thereof is delayed or rendered impossible by acts of God, war, civil commotion, governmental action, fire, storm, flood, explosion, strikes, walkouts, or other industrial disturbances, or any other causes of any nature which is beyond its reasonable control.

28. **PATENT/COPYRIGHT.** Contractor shall indemnify, hold harmless and defend, at its sole cost and expense, the Indemnified Parties from any loss, damage, expense (including attorneys' fees and costs), payment, recovery and judgment arising out of any claim or threatened claim, alleging that any Services furnished hereunder infringe upon or violate a patent, copyright, trademark, trade secret or other proprietary right of any third party. Owner, at its sole cost and expense, shall have the right to be represented in any such action or proceeding by independent counsel of Owner's own choice. Contractor's liability under this Section shall survive the expiration or termination of this Agreement, but this shall not be construed to mean that Contractor's liability does not survive as to other provisions of this Agreement.

29. **ENTIRE AGREEMENT.** This Agreement and any Exhibits attached hereto, shall constitute the entire understanding between the parties with respect to the subject matter hereof and all prior representations or agreements, whether written or oral, are merged herein. This Agreement shall not be varied by an oral agreement or representation or by anything other than an instrument in writing of a subsequent date hereto, executed by both parties by their duly authorized representatives.

30. **SEVERABILITY.** In the event any provision of this Agreement is held to be illegal or unlawful, then the same shall be struck here from and all other provisions shall remain valid and in full effect.

31. **ASSIGNMENT BY OWNER.** Owner shall have the right in its sole and absolute discretion to assign its rights and obligations under this Agreement to any other party. If the Property is at any time sold or otherwise conveyed to a new owner (directly or indirectly), Contractor agrees that this Agreement may be assigned to the new owner and Contractor agrees that it will be paid only from funds furnished by the new owner for obligations then due or which thereafter become due to Contractor under this Agreement. Notwithstanding the foregoing, Owner may elect by giving prior written notice to Contractor, to terminate this Agreement effective as of the date that such sale is completed, in which event this Agreement shall, except as otherwise provided herein, be of no further force or effect. In addition to the foregoing it is understood and agreed that if this Agreement is assigned to a purchaser of the Property, then from and after the date of such assignment Manager and Owner shall be released and discharged from any and all liability under this Agreement arising after the date of such assignment, and the purchaser of the Property shall be responsible for any and all such liability under this Agreement arising after the date of such assignment, and Contractor will not assert any prior default of Owner under this Agreement as a defense to the performance by Contractor of its obligations under this Agreement.

32. **CONTROLLING PROVISIONS.** If there is any inconsistency between the terms of any of the Sections of this Agreement and the terms of any Exhibit annexed hereto, the terms of this Agreement shall control.

33. **NO THIRD PARTIES BENEFITED.** Nothing contained in this Agreement, either expressed or implied, is intended or should be construed to confer upon or give any person or entity, other than Manager, Owner or Contractor, or, subject to the terms of this

Agreement, their successors and assigns, any rights or remedies under or by reason of this Agreement.

34. **NOTICES.** All notices and correspondence required to be given to Manager or Owner or Contractor hereunder shall be addressed as set forth on the cover page to the attention of the person indicated, if any. Any party may designate a different address for the service of notices by notice given in accordance with this Paragraph.

Any and all notices required or which either party herein may desire to give to the other shall be made in writing and shall be given by certified or registered mail, postage prepaid, return receipt requested, or by recognized overnight courier, such as Federal Express or Airborne Express, and shall be deemed to be given on the third business day following the date of posting in a United States Post Office or branch post office or one business day after delivery to the overnight courier, and shall be addressed as set forth above.

35. **INSURANCE.**

(a) Contractor shall, throughout the duration of this Agreement and for such additional time periods as required below, purchase and maintain, at its expense, and from time to time renew, such insurance as will protect the Contractor and the Indemnified Parties from claims which may arise out of or result from the operations under this Agreement and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a subcontractor or by anyone directly or indirectly employed by any of them, and to meet the following minimum requirements:

(i) Worker's Compensation Insurance in statutory amounts.

(ii) Employer's Liability Insurance in the minimum amount of $2,000,000.00.

(iii) Commercial General Liability Insurance on an occurrence form in the minimum amount of $2,000,000.00 per occurrence covering both Bodily Injury and Property Damage and $3,000,000.00 in the aggregate on a per project basis including coverage for premises operations, personal and advertising, independent contractors, products and completed operations and broad form contractual liability coverage for Contractor's indemnification as provided for in this Agreement; products and completed operations coverage shall be maintained for not less than three (3) years following completion of work.

(iv) Comprehensive Automobile Liability Insurance in the minimum amount of $1,000,000.00 combined single limit for Bodily Injury and Property Damage if automobiles are used in the performance of Contractor's obligations hereunder and including coverage for owned, non-owned and or hired vehicles.

(v) Non-occupational and Disability Insurance, if required by the State where the Property is located.

(vi) In the event that Contractor is to park motor vehicles as part of the Services herein, Garage Keepers Legal Liability Insurance in an amount of not less than $1,000,000, which insurance may be subject to a deductible provision not to exceed $250 per occurrence.

(vii) In the event Contractor is to operate a parking garage as part of the Services herein, Garage Liability Insurance in an amount of not less than $1,000,000 combined single limit.

(viii) Liquor Liability Insurance shall be maintained by any Contractor providing and or serving alcohol as part of the Services herein, with a limit of not less than $2,000,000.

(ix) Umbrella/Excess Liability Insurance in the minimum amount of $5,000,000 covering both Bodily Injury and Property Damage on a form that is not more restrictive than underlying and providing excess coverage to the Commercial General Liability, Auto Liability, Liquor Liability, Employers Liability and Garage Liability as applicable.

(x) Professional Liability / Errors and Omissions Insurance shall be maintained by any consultant or Contractor providing professional services. Such coverage shall be maintained at its own cost with limits of not less than $2,000,000 for each claim and $2,000,000 in the aggregate covering financial loss as well as bodily injury and property damage arising from errors and omissions committed in the performance of Professional Services. This insurance shall provide coverage for the Professional Services performed under this

Agreement by the consultant or Contractor or anyone directly or indirectly employed by it. Contingent bodily injury and property damage coverage shall not be subject to any sublimit. Such coverage may be provided on a "claims-made" policy form, provided the coverage effective date precedes the date upon which services begin and is maintained by renewal or extended reporting provision for not less than three (3) years after completion of services.

(xi) Contractors Pollution Liability Insurance shall be maintained by any Contractor providing services and or performing operations relating construction, renovation, environmental abatement, remediation or work involving use, treatment, storage, removal or transportation of hazardous materials at, to or from the property, with limits of liability not less than $5,000,000, covering all operations performed and including coverage for cleanup, bodily injury and property damage and having no mold exclusion. With respect to all contractors transporting and/or disposing of hazardous waste, such insurance must also include coverage for transportation and all owned and/or non- owned disposal sites to which waste is hauled, all on a primary and non-contributory basis and continuing for not less than two (2) years following completion of work and on terms otherwise satisfactory to Owner.

All such insurance shall be issued by Companies licensed to do business in the state where the Property is located, having a Best's rating of not less than A-VIII, and otherwise satisfactory to Owner. All of such policies (with the exception of professional liability insurance) shall be on an "occurrence basis" and the parties listed on Exhibit C attached hereto, and any and all other parties identified by Owner, from time to time, shall be named as additional insureds ("**Additional Insureds**") under Contractor's General Liability, Automobile Liability and Excess Liability insurance policies for the full term required including products and completed operations terms. Certificates of insurance in customary form, evidencing that premiums for the foregoing insurance have been paid, shall be delivered by Contractor to Manager simultaneously with Contractor's execution of this Agreement and prior to Contractor performing any Services hereunder. Within thirty (30) days prior to expiration of such insurance similar updated certificates of insurance shall be delivered by Contractor to Manager evidencing the renewal of such insurance, together with evidence satisfactory to Manager of the payment of the premium. All certificates of insurance must contain a definite provision that if the policies of insurance evidenced by such certificates are canceled or changed during the periods of coverage as stated therein, in such a manner as to effect the coverage afforded by such policies, written notice will be mailed to Manager and Owner by certified mail and return receipt requested at least thirty (30) days prior to such cancellation or change.

(b) Contractor shall procure an appropriate clause in, or endorsement on, each of its policies for fire or extended coverage insurance where applicable and be responsible to maintain property damage insurance covering the Contractor's personal property, materials or equipment whereby the insurer waives subrogation or consents to a waiver of the right of recovery against Manager and Owner, and having obtained such waiver of subrogation or waiver of the right of recovery, Contractor hereby agrees that it will not make any claim against or seek to recover from Manager or Owner for any loss or damage to property of the type covered by such insurance. Contractor and any of its subcontractors, agents and employees, also agree to waive all rights of recovery and subrogation against the Owner and manager and will have their insurance policies required to be maintained above provide waivers of subrogation by endorsement or otherwise.

(c) Contractor's Comprehensive General Liability Insurance shall be primary, and any such insurance maintained by Manager and/or Owner shall be secondary and non-contributory and excess over the Comprehensive General Liability Insurance to be maintained by Contractor hereunder.

(d) No deductibles maintained by Contractor shall be applied to Owner or Manager and shall be the full responsibility of the Contractor.

(e) In the event that the Contractor has in force any insurance coverage with coverages broader and/or limits higher than the minimum coverage amounts specified hereunder, (1) such broader terms and higher limits shall insure and be available to each of the Additional Insureds and (2) this Contract shall be deemed to require such broader terms and higher limits.

(f) Any insurance limits required by this Agreement are minimum limits only and are not intended to restrict the liability imposed on any Contractor for work performed under this Agreement.

(g) Contractor agrees that the provisions set forth in this Paragraph 35 shall be imposed upon, assumed and performed by each of its subcontractors, if any.

36. **PERSONAL PROPERTY**. All of the equipment, effects and property of every kind of Contractor, and all persons claiming, by, through or under Contractor, which may be at the Property, shall be at the sole risk and hazard of Contractor and if the whole or any part thereof shall be destroyed, damaged, or stolen, no part of said loss or damage is to be charged to or borne by Owner. Upon the expiration or earlier termination of this Agreement, Contractor shall remove all of its personal property from the Property.

37. **CONTINUANCE OF PERFORMANCE**. Unless ordered by a court of competent jurisdiction or otherwise agreed in writing between Contractor and the Owner, during all disputes, or actions, claims or other matters arising out of or relating to this Agreement or the breach thereof, provided Owner continues to pay undisputed amounts, Contractor shall perform the undisputed portion of the Services to be provided by Contractor hereunder.

38. **CONFIDENTIALITY OF OWNER'S RECORDS.**

(a) Contractor acknowledges that all information disclosed by Owner or Manager to Contractor for purposes of performing the Services, or which come to the attention of Contractor during the course of performing such Services, constitutes a valuable asset of and is proprietary to Owner and/or Manager. Contractor also acknowledges that Owner, as a party in the business community, may have fiduciary responsibilities to its tenants or customers to keep their records confidential and proprietary. Contractor shall not disclose said information or knowingly permit its employees, officers or agents to disclose said information, to any non-employee of Contractor or to any employee of Contractor not having a specific need-to-know in performing the Services authorized by Manager and Owner. All of the data, notes, estimates, computations, sketches, photographs, presentations, renderings, computer programs and all other materials relating to the Services are and shall remain, together with all copyright privileges, the property of Owner. Additionally, Contractor agrees that all designs, plans, reports, specifications, drawings, inventions, processes and other information or items produced by Contractor for purposes of performing the Services, will be assigned to Owner as the sole and exclusive property of Owner and Owner's assigns, nominees and successors. Contractor shall not record this Agreement or any notice or short form of this Agreement.

(b) Contractor further agrees to instruct its employees, officers and agents not to sell, lease, assign, transfer or reveal to any organization, company or individual any of said information whether oral or written, without the prior written consent of Owner, and agrees to take all reasonable steps necessary to ensure fulfillment of this obligation.

(c) In the event that a subpoena or other legal process is served upon Contractor that in any way concerns information disclosed by Owner or Manager to Contractor, Contractor agrees to notify Owner and Manager immediately upon receipt of such subpoena or other legal process and will cooperate with Manager and Owner, at Owner's

expense, in any lawful effort by Owner and/or Manager to contest the legal validity of such subpoena or other legal process. This Section 38 shall survive the termination of this Agreement.

39. **CONTROLLING LAW, JURISDICTION AND VENUE**. This Agreement and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by the laws of the state in which the Property is located, without application of conflicts of law principles. Any legal proceeding relating to this Agreement shall be brought and heard exclusively in the state courts located in county where the Property is located and the parties hereby irrevocably consent and submit to personal jurisdiction exclusively in said courts. No rights or remedies available to either party under this Agreement or by operation of law are waived or modified unless expressly waived or modified by that party in writing.

40. **EXECUTION IN COUNTERPARTS**. This Agreement may be executed in counterparts, each of which shall be deemed to be an original as against any party who signs the counterpart. All counterparts together shall constitute one instrument. This Agreement shall become binding when one or more counterparts, individually or together, bears the signatures of all of the parties reflected as the signatories. The parties acknowledge and agree that this Agreement may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature.

41. **INTERPRETATION.** Each party agrees to the use of the particular language of the provisions of this Agreement, and any questions of doubtful interpretation shall not be resolved by any rule or interpretation against the draftsman, but rather in accordance with the fair meaning thereof, having due regard to the benefits and rights intended to be conferred upon the parties and the limitations and restrictions upon such rights and benefits intended to be provided.

42. **MISCELLANEOUS.** Notwithstanding anything to the contrary in this Agreement:

(a) Contractor shall implement internal protocols for its personnel consistent with (x) the Center for Disease Control and Prevention's (CDC's) Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19), May 2020, and (y) any applicable state and local law, ordinance or regulation related to or in response to the COVID-19 pandemic, each as may be amended, from time to time (together, the "CDC COVID-19 Guidance").

(b) Until further notice from Owner, while on-site at the Property, Contractor's personnel shall wear (i) a face covering, (ii) any personal protective equipment recommended in the then current CDC COVID-19 Guidance, including but not limited to gloves, and (iii) any other personal protective equipment reasonably requested by Owner.

(c) Contractor shall perform a daily personal health screen of its personnel prior to the personnel entering the Property consistent with the protocols in the then current CDC COVID-19 Guidance. Any individual with a fever (over 100 degrees Fahrenheit) or who is experiencing other potential COVID-19 related symptoms, is living with or has been in close contact with anyone confirmed to be COVID positive or showing the symptoms of COVID, should not report to the Property until cleared to return to work pursuant to the protocols of the CDC COVID-19 Guidance.

(d) Contractor shall notify Owner immediately if any of Contractor's personnel performing Services at the Property tests positive for the COVID-19 virus and shall not permit the employee to return to the Property until CDC COVID-19 Guidance authorizes return.

(e) Contractor acknowledges and agrees that all of its employees, contractors, subcontractors, agents and all other persons performing the Services have been or will be properly trained on the use of personal protective equipment prior to entering the Building and/or performing the Services.

IN WITNESS WHEREOF, this Agreement is executed by the parties set forth below as of ________________, __________.

**Contractor:**

**Sky Safety, Inc.**

By: B. Bertoncini
Print Name: Bianca Bertoncini
Title: President
Hereunto Duly Authorized

**Owner:**

**100 Summer Owner LLC,**

By: Rockhill Management, L.L.C., as agent for Owner

By: [signature]
Print Name: Jennifer Twombly
Title: General Manager

Rockhill Form
7/2021

**EXHIBIT A**

**Description of Services**

See attached.

**EXHIBIT B**

**Contract Payment Terms**

[To be attached, if applicable]

2023 Window Cleaning Pricing- 100 Summer Street, Boston MA

| Scope of Work | Frequency | Pricing | Total |
|---|---|---|---|
| Exterior Window Cleaning | 2 | $ [redacted] | $ [redacted] |
| Interior Window Cleaning | 1 | $ [redacted] | $ [redacted] |
| Exterior 1st Floor & Canopy | 6 | $ [redacted] | $ [redacted] |
| | | Total Contract | $ [redacted] |

Labor Rates [redacted] (per hour)
Special Request/Caulking/Bird
Abatement, etc.
[redacted] (per hour)

## EXHIBIT C

**Additional Insureds**

100 Summer Owner LLC

Rockhill Management, L.L.C.

Rockpoint Real Estate Fund VI, LP

Rockpoint Real Estate Parallel Fund V AIV, LP

Rockpoint Real Estate Parallel Fund VI FR, LP

RP 100 Summer Member, LLC

100 Summer Holdings, LLC

PO Square Parking Owner, LLC

100 Summer Club LLC

# EXHIBIT C

# SERVICE AGREEMENT

**Description (including address) of property:**

100 Summer Street
Boston, MA 02110
(hereinafter "**Property**")

**Owner:** 100 Summer Owner LLC
500 Boylston Street, Suite 2100
Boston, MA 02116
Attention: Joseph Goldman
(hereinafter "**Owner**")

**Property Manager:** Rockhill Management, L.L.C.
100 Summer Street, 32nd Floor
Boston, MA 02110
Attention: Property Manager
(hereinafter "**Manager**")

**Contractor:** American Anchor, Inc.
305 Constitution Drive, Suite 1
Taunton, MA 02780
Attention: Sandy Brown
(hereinafter "**Contractor**"),

**Contractor's Federal Tax ID Number:** #______________________

**Services:** To inspect all fall protection equipment on the 100 Summer St. roof & services as more particularly described in Exhibit A attached hereto (hereinafter "**Services**") to be provided by Contractor in accordance with the terms hereof.

**Term of Contract:** From 10/01/2023 to 09/30/2024, subject to termination and the other provisions hereof (the "**Term**").

**Contract Payment Terms:** $925.00 in arrears payable against invoice therefor, or as otherwise set forth on Exhibit B annexed hereto and made a part hereof.

## SERVICE CONTRACT TERMS

1. **SERVICES.** Contractor agrees to perform for the term specified, the Services listed on Exhibit A attached hereto and made a part hereof. Exhibit A is being attached solely for the limited purpose of describing the parties understanding of the scope of the Services to be performed by Contractor. All operational logs and records relating to the Services prepared and/or maintained by Contractor or in the custody of Contractor shall not be destroyed without the prior written consent of Owner or Manager and shall be returned to either Owner or Manager at the expiration of the Term. Contractor agrees to furnish at its expense all labor, supplies, uniforms, equipment and materials necessary to properly perform the Services. Contractor shall permit and facilitate inspection of the Services by Owner and its representatives (including, but not limited to, Manager) and public authorities at all times. Failure of Manager or Owner during the Term of this Agreement to discover or reject unacceptable Services, or Services not performed in accordance with this Agreement, shall not be deemed an acceptance thereof nor a waiver of Owner's right to the proper execution of the Services or any part thereof by Contractor. In no event shall Contractor's liability, for any and all damages, claims or expenses, be limited by the language of any attachment to this Agreement. The provisions of this Agreement shall control in the event of any conflict between the terms of any attachment hereto and this Agreement. Upon payment for services rendered, Owner shall have all rights of ownership for any work product produced under this Agreement.

2. **PERMITS, LICENSES.** If any government permit, license or authorization shall be required or necessary for the proper and lawful performance of the Services hereunder or if the failure to secure such license, permit or authorization would, in any way, affect the Property, Manager or Owner, then Contractor, at Contractor's expense, shall duly procure and thereafter maintain such license, permit or authorization and submit the same to Owner for inspection, if requested. Contractor, at Contractor's expense, shall at all times, comply with the terms and conditions of each such license, permit and authorization and shall notify Owner immediately should any such license, permit or authorization no longer be in effect or in good standing.

3. **WAIVER OF TRIAL BY JURY**. The parties hereto shall and they hereby do waive, where permitted by law, trial by jury in any action, proceeding or counterclaim brought by any of the parties hereto against the other in any matters whatsoever arising out of, or in any way connected with, this Agreement.

4. **NON-WAIVER PROVISIONS.** The failure of Manager or Owner to insist in any one or more instances upon the strict performance of any of the covenants, terms, provisions or conditions of this Agreement or to exercise any election herein contained shall not be construed as a waiver or a relinquishment for the future of such covenant, term, provision, condition or election, but the same shall continue and remain and be in full force and effect. No waiver by Manager or Owner of any covenant, term, provision or condition of this Agreement shall be deemed to have been made unless expressed in writing and signed by Owner.

5. **LABOR HARMONY.** Contractor agrees that it will not at any time prior to or during the Term of this Agreement, either directly or indirectly, use any subcontractors and/or labor and/or materials which would or will create any difficulty with other contractors and/or subcontractors and/or labor engaged by Contractor, Manager, Owner or others in the construction, repair, improvement, maintenance and/or operation of the Property or any part thereof. Contractor agrees to notify Manager and Owner promptly of any events Contractor believes may result in a work stoppage, slowdown, labor dispute, strike or other labor related disruption. Contractor agrees to work in harmony with all contractors and laborers employed by Manager, Owner or others in connection with the Property. In the event of any work-stoppage or other disruption which involves the participation of Contractor's personnel whether as a result of a dispute with Contractor or due to third party actions involving informational or organizational picketing or picketing by any labor organization against any other employer, Contractor agrees to take appropriate and prompt action to provide qualified personnel to perform the Services and to minimize any delay in performing the Services by fully cooperating in obtaining injunctions, presentation of facts, furnishing of witnesses and assisting in every reasonable way to eliminate any work-stoppage or other disruption or the effect of any work-stoppage or other disruption, or to follow such

other directions as Owner shall issue. Should Contractor fail to comply with this provision, Owner shall have the right, upon written notice to Contractor, to terminate this Agreement without any liability to Contractor.

6. **ASSIGNMENT BY CONTRACTOR.** Contractor shall not assign this Agreement nor any interest therein without the prior written consent of Owner, which consent may be withheld at Owner's sole and absolute discretion. The transfer of a majority interest of the voting stock or general partnership interests in Contractor shall be deemed an assignment of this Agreement by Contractor. Any attempted assignment of this Agreement or any interest therein without the prior written consent of Owner shall be null and void. Manager is a third-party beneficiary of this Agreement.

7. **SUBCONTRACTING.** Contractor may only sub-contract with the prior written consent of Owner, which consent may be withheld at Owner's sole and absolute discretion. Every subcontract must provide that the same is subject to all of the covenants, terms, provisions and conditions of this Agreement and must provide that in the event of termination or cancellation of this Agreement for any reason whatsoever, prior to the expiration of such subcontract, the subcontract will automatically terminate on the same date this Agreement is terminated or canceled.

8. **ADDITIONAL DEFINITIONS.** It is understood that wherever the terms "adequate" or "as required" or "as necessary" or "if necessary" are stated in this Agreement (including any Schedule attached hereto), these terms shall be construed to mean "as determined by Owner".

9. **DISCHARGE OF EMPLOYEES.** Owner and/or Manager shall have the right at any time, and at their sole discretion, to recommend that Contractor remove any employee of Contractor who is objectionable to Owner and/or Manager from employment at the Property and Contractor shall promptly after demand by Manager or Owner, discharge or transfer from the Property such employee of Contractor, provided, however, that if the effectuating of such discharge or transfer is limited by the contract between Contractor and the employee's union, Contractor agrees to use its best efforts within the limits of such union contract to effectuate such discharge or transfer as promptly as possible.

10. **MECHANIC'S LIENS.** Contractor agrees that if any mechanic's lien is filed against the Property for work done, services claimed to have been rendered or materials claimed to have been furnished in connection with or pursuant to any of the provisions of this Agreement, then Contractor shall cause such mechanic's lien to be discharged within ten (10) days after filing, at Contractor's expense, by: i) filing the bond required by law; or ii) providing Owner with a copy of the court order discharging such lien. Contractor will defend, indemnify and hold harmless the Manager, Owner, and their respective shareholders, stockholders, officers, directors, principals, partners, beneficiaries, subsidiaries, employees and Affiliates (hereinafter defined), and their respective heirs, successors and assigns (the foregoing parties referred to collectively herein as the "**Indemnified Parties**") any and all damages, liabilities, costs and expenses (including attorneys' fees) suffered or incurred by such parties as a result of Contractor's failure to comply with this provision. Upon Contractor's failure to comply herewith, the lien may be bonded or discharged by Manager or Owner at Contractor's sole expense. Contractor shall, upon demand, reimburse Owner for all costs incurred in connection with any such action by Owner, including, without limitation, reasonable attorneys' fees and costs incurred in connection therewith. Contractor's liability under this Section shall survive the expiration or termination of this Agreement, but this shall not be construed to mean that Contractor's liability does not survive as to other provisions of this Agreement.

11. **NON-INTERFERENCE.** Contractor shall perform the Services so as not to unreasonably interfere with Manager's or Owner's operation of the Property or the business operations of any tenant or other occupant of the Property.

12. **CONTRACTOR RESPONSIBILITY.** Contractor shall be responsible to Manager and Owner for the acts and omissions of Contractor's suppliers, agents, employees and subcontractors. All contracts entered into by Contractor with any subcontractors shall require the subcontractors to be responsible for the acts and omissions of their agents and employees and compliance with the provisions of this Agreement

to the extent applicable to the subcontractor's portion of the Services. Personnel supplied by Contractor or any subcontractor will be deemed employees of Contractor or the subcontractor, as the case may be, and will not for any purpose be considered employees or agents of Manager or Owner. Contractor assumes full responsibility for the actions of such personnel while performing Services pursuant to this Agreement, and shall be solely responsible for their supervision, daily direction and control, payment of salary or equivalent (including, withholding of income taxes, stock options, contributions to pension or similar retirement programs, overtime pay, education programs, awards, special recognition events and social security contributions), worker's compensation, disability benefits, social security taxes, unemployment insurance and the like. Contractor shall not discriminate against any employee or applicant for employment because of race, color, religion, gender, sexual orientation, age, disability or national origin. Contractor warrants that it is and throughout the Term of this Agreement will continue to be in full compliance with all Equal Employment Opportunity (E.E.O.) provisions as required by law, regulation or executive order, specifically including but not limited to, the provisions of executive order 11246 of September 24, 1965 as amended. If applicable, Contractor also agrees to execute and to keep in full force and effect throughout the Term of this Agreement a Compliance Undertaking Standard Form 100 (Equal Employment Opportunity Employer Information Report E.E.O.-1).

13. **MAINTENANCE OF RECORDS.** Contractor shall maintain written records in accordance with generally accepted accounting procedures showing in detail all costs which it incurs and payments which it receives in the performance of this Agreement. Such records shall include, but shall not be limited to, payroll records, job cards, attendance cards and job summaries and shall be subject to audit and inspection by Manager and Owner during the Term of this Agreement and for seven (7) years after its expiration or earlier termination, unless a longer period is required by law. Contractor agrees that if work and materials to be furnished by Contractor hereunder are for a building in which an office of the United States of America as a tenant is located, and if this Agreement is for an amount exceeding $2,500, Contractor shall permit the Controller General of the United States or any of his or her duly authorized representatives to have access to, and the right to examine any directly pertinent books, documents, papers and records pertaining to this Agreement until the expiration of three (3) years after final payment of any monies has been made pursuant to the provisions of this Agreement.

14. **COMPLIANCE WITH LAWS AND POLICIES.** Contractor shall at all times comply with all applicable federal, state and local laws, codes, ordinances, rules and legal requirements affecting the Services, as well as Manager's and Owner's directives, guidelines, procedures, rules, regulations and the like which are furnished to Contractor.

15. **TRADEMARK AND PUBLICITY.** Contractor shall have no right to use either Manager's or Owner's trademark or trade name, the Property name or any image thereof or to refer to this Agreement or the Services performed hereunder directly or indirectly in connection with any product, promotion, advertisement or publication, or the like, without Owner's prior written approval, as appropriate, which approval may be withheld at Owner's sole discretion.

16. **ETHICAL STANDARDS.** Contractor agrees that it will not make or confer, or offer to make or confer, any payment to or benefit upon any third party (including, without limitation, any government agency or instrumentality thereof) with the intent to influence the conduct of such third person regarding this Agreement or the business affairs of any of the parties to this Agreement or of the third party. Contractor shall not give or offer gifts or gratuities of any type or offer trade discounts not available to the general public, to Manager's or Owner's employees or members of their families. Violation of this provision by anyone employed or retained by Contractor, or by Contractor itself, shall constitute a default under this Agreement by Contractor.

17. **PREVAILING PARTY.** In any action or proceeding commenced by any party against the other party in connection with this Agreement, the losing party shall reimburse the prevailing party for the reasonable attorneys' fees and disbursements incurred by the prevailing party in prosecuting or defending said action or proceeding.

18. **Intentionally omitted**.

19. **LIMITATION ON LIABILITY.** No general or limited partner in or of Owner or Manager, whether direct or indirect, or any direct or indirect partners in such partners or any disclosed or undisclosed officers, shareholders, principals, directors, employees, members, partners, servants or agents of Owner or Manager shall be personally liable under this Agreement. The liability of Owner (including any assignee or successor of Owner) for shall be limited to Owner's interest in the Property. In the event this Contract is executed by Manager on behalf of Owner, Contractor acknowledges and agrees that Manager is executing this Contract in its capacity as Owner's agent and that Manager shall have no liability or obligation to Contractor under this Agreement. In no event shall either party be liable to the other for any indirect, speculative, special, consequential, or punitive damages arising out of this Agreement.

20. **INDEPENDENT CONTRACTOR.** Owner hereby engages Contractor to perform, as an independent contractor, the Services set forth in this Agreement. Nothing contained herein shall be deemed or construed to create any association, partnership, joint venture or relationship of principal and agent or master and servant or employer and employee between the parties hereto or any Affiliates or subsidiaries thereof, or to provide either party with the right, power or authority whether expressed or implied, to create any duty or obligation on behalf of the other party or to bind the other party by virtue of this Agreement, except as expressly provided in this Agreement.

Contractor shall be responsible for the safety of its own employees. Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Services, including safety of all persons and property during performance of the Services. This requirement will apply continuously and will not be limited to working hours.

Contractor warrants that it has reviewed and inspected the site of the Property, and that it has satisfied itself as to the local conditions and special requirements related to the site, and any other characteristics that are relevant to, or impact upon, the performance of the Services.

21. **TERMINATION.**

(a) Owner shall have the right, in its sole and absolute discretion and without payment of any penalty, premium or termination fee, to terminate this Agreement in whole or in part at any time during the Term hereof upon thirty (30) days prior written notice to Contractor. Notwithstanding anything to the contrary set forth herein, in no event shall the Term of this Agreement exceed one (1) year, nor shall the Term of this Agreement automatically extend or renew.

(b) If Contractor shall default in the performance of any of its obligations under this Agreement, or commits a criminal act in connection with its provision of the Services hereunder, then Manager and Owner shall each have the right, without payment of any penalty, to terminate this Agreement in whole or in part immediately upon written notice to Contractor.

(c) If a receiver, liquidator or trustee for Contractor shall be appointed by court order; or a petition shall be filed against Contractor under any bankruptcy, reorganization or insolvency law; or Contractor shall file a petition in voluntary bankruptcy or shall request reorganization under any provision of voluntary bankruptcy, reorganization or insolvency laws; or if Contractor shall make an assignment for the benefit of creditors, then this entire Agreement shall immediately terminate upon the happening of any such event.

(d) Owner shall have the right, in its sole and absolute discretion and without payment of any penalty, to terminate this Agreement (i) as set forth in Section 31 below, and (ii) immediately upon the sale of the Property or Owner's interest therein.

22. **INDEMNIFICATION.** Contractor shall, to the fullest extent permitted by law, indemnify, defend and hold harmless the Indemnified Parties from and against any and all liability, claims, demands, losses, damages, actions, costs and expenses (including attorneys' fees and investigation costs), payments, recoveries and judgments arising out of, in connection with, or caused in any manner by (i) the acts or omissions of the Contractor, and its directors, officers, employees, contractors, subcontractors and agents, which constitute negligence, fraud, breach of this Agreement, breach of fiduciary duty, willful, reckless or criminal misconduct or any actions of Contractor

beyond the scope of authority conferred upon Contractor pursuant to the terms of this Agreement or (ii) the performance or failure to perform any Services under this Agreement or (iii) the breach of any representation or warranty, or any provision or obligation, set forth herein by Contractor, or Contractor's employees or agents or subcontractors, excepting only liability arising from the sole negligence or willful misconduct of Owner or Manager. Contractor shall, at its own expense, defend any and all actions brought against the Indemnified Parties based upon any of the foregoing and shall pay all attorneys' fees and all other expenses, and promptly discharge any judgments, settlements or compromises arising therefrom. Contractor's liability under this Section shall survive the expiration or termination of this Agreement, but this shall not be construed to mean that Contractor's liability does not survive as to other provisions of this Agreement. For purposes of this Agreement, "Affiliates" shall mean any Person, any relative of the Person in question, if such Person is an individual, or any other Person directly or indirectly through one or more intermediaries is Controlled by, Controlling or under common Control with the Person in question. For purposes of this Agreement, "Person" means any individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or its agency or instrumentality.

23. **COMPENSATION.**

(a) In consideration for all of the Services to be rendered by Contractor hereunder, Contractor shall be paid, subject to the provisions of this Agreement, the compensation set forth on the cover page hereof or any Exhibit referred to thereon.

(b) Undisputed payment for services performed shall be made once a month, in arrears.

(c) Contractor agrees that Manager is acting only as the property manager of the Property, is not a party to this Agreement and has no liability or obligation to Contractor hereunder.

24. **STANDARD OF OPERATIONS.** Contractor shall perform the Services in an efficient, lawful and appropriate manner appropriate to the nature of the Property and in accordance with Owner's and/or Manager's instructions and Contractor shall perform the Services hereunder at all times with due care and in accordance with standards for similar services prevailing nationally.

25. **Intentionally omitted.**

26. **SERVICES GUARANTEE.** Contractor agrees to perform all Services in a good, timely and workmanlike manner acceptable to Owner. Contractor unconditionally guarantees all materials, equipment and labor provided under this Agreement for one (1) year after date of final payment to Contractor hereunder or the date of final acceptance of the Services, whichever date is later and shall repair or replace within said period, at its sole cost and expense, any labor, materials or equipment provided or furnished under this Agreement that is damaged, defective or not satisfactory. Contractor shall make or commence to make, within three (3) days of its receipt of written notice from Manager or Owner during the guaranty period, any and all repairs or replacements, without cost to and to the satisfaction of Manager or Owner. If Manager or Owner determine that an emergency exists which requires more immediate action than Contractor is able to provide, Manager or Owner may, without sending any notice to Contractor, perform or cause to be performed such repairs or replacements that Contractor is required to make pursuant to this provision, in which event Contractor shall compensate Owner for the cost thereof not later than ten (10) business days after receipt of written demand therefor. Any repairs or replacements that Contractor is required to make pursuant to this provision shall be prosecuted to completion by Contractor even if such repairs or replacements may not be completed until after the expiration of the guaranty period. The obligations of Contractor to make repairs or replacements under this provision shall not be satisfied, unless the Owner so elects, by the payment of money to the Owner. If Manager or Owner determine in their sole and absolute discretion that any labor furnished or materials or equipment installed under this Agreement are inherently defective, thus being incapable of repair, then Contractor shall, upon notification by Manager or Owner of such a determination, provide a replacement for said labor, materials or equipment. In the event that Contractor fails to comply with this provision, the Owner may, in addition to exercising all other legal and equitable remedies it may have, (1) deduct from any payment due or thereafter to become due to

Contractor under this Agreement, the amount of damage, cost or expense caused by said failure by the Contractor, and (2) perform or cause to be performed any needed repairs and replacements, in which event Contractor shall compensate the Owner for the cost thereof. The foregoing Guarantee is in addition and supplementary to any other guarantee which may be provided by Contractor. Warranties and guarantees issued by manufacturers of materials or equipment furnished by Contractor under this Agreement shall not in any way serve to limit the obligations of Contractor under this provision. Notwithstanding the foregoing sentence, any such warranties or guaranties shall inure to the benefit of Manager and Owner, their successors and assigns, and Contractor shall, to the extent possible, assign such warranties and guaranties to Owner.

27. **ACTS BEYOND REASONABLE CONTROL.** No party shall be considered in default of any of its obligations under this Agreement to the extent that performance thereof is delayed or rendered impossible by acts of God, war, civil commotion, governmental action, fire, storm, flood, explosion, strikes, walkouts, or other industrial disturbances, or any other causes of any nature which is beyond its reasonable control.

28. **PATENT/COPYRIGHT.** Contractor shall indemnify, hold harmless and defend, at its sole cost and expense, the Indemnified Parties from any loss, damage, expense (including attorneys' fees and costs), payment, recovery and judgment arising out of any claim or threatened claim, alleging that any Services furnished hereunder infringe upon or violate a patent, copyright, trademark, trade secret or other proprietary right of any third party. Owner, at its sole cost and expense, shall have the right to be represented in any such action or proceeding by independent counsel of Owner's own choice. Contractor's liability under this Section shall survive the expiration or termination of this Agreement, but this shall not be construed to mean that Contractor's liability does not survive as to other provisions of this Agreement.

29. **ENTIRE AGREEMENT.** This Agreement and any Exhibits attached hereto, shall constitute the entire understanding between the parties with respect to the subject matter hereof and all prior representations or agreements, whether written or oral, are merged herein. This Agreement shall not be varied by an oral agreement or representation or by anything other than an instrument in writing of a subsequent date hereto, executed by both parties by their duly authorized representatives.

30. **SEVERABILITY.** In the event any provision of this Agreement is held to be illegal or unlawful, then the same shall be struck here from and all other provisions shall remain valid and in full effect.

31. **ASSIGNMENT BY OWNER.** Owner shall have the right in its sole and absolute discretion to assign its rights and obligations under this Agreement to any other party. If the Property is at any time sold or otherwise conveyed to a new owner (directly or indirectly), Contractor agrees that this Agreement may be assigned to the new owner and Contractor agrees that it will be paid only from funds furnished by the new owner for obligations then due or which thereafter become due to Contractor under this Agreement. Notwithstanding the foregoing, Owner may elect by giving prior written notice to Contractor, to terminate this Agreement effective as of the date that such sale is completed, in which event this Agreement shall, except as otherwise provided herein, be of no further force or effect. In addition to the foregoing it is understood and agreed that if this Agreement is assigned to a purchaser of the Property, then from and after the date of such assignment Manager and Owner shall be released and discharged from any and all liability under this Agreement arising after the date of such assignment, and the purchaser of the Property shall be responsible for any and all such liability under this Agreement arising after the date of such assignment, and Contractor will not assert any prior default of Owner under this Agreement as a defense to the performance by Contractor of its obligations under this Agreement.

32. **CONTROLLING PROVISIONS.** If there is any inconsistency between the terms of any of the Sections of this Agreement and the terms of any Exhibit annexed hereto, the terms of this Agreement shall control.

33. **NO THIRD PARTIES BENEFITED.** Nothing contained in this Agreement, either expressed or implied, is intended or should be construed to confer upon or give any person or entity, other than Manager, Owner or Contractor, or, subject to the terms of this

Agreement, their successors and assigns, any rights or remedies under or by reason of this Agreement.

34. **NOTICES.** All notices and correspondence required to be given to Manager or Owner or Contractor hereunder shall be addressed as set forth on the cover page to the attention of the person indicated, if any. Any party may designate a different address for the service of notices by notice given in accordance with this Paragraph.

Any and all notices required or which either party herein may desire to give to the other shall be made in writing and shall be given by certified or registered mail, postage prepaid, return receipt requested, or by recognized overnight courier, such as Federal Express or Airborne Express, and shall be deemed to be given on the third business day following the date of posting in a United States Post Office or branch post office or one business day after delivery to the overnight courier, and shall be addressed as set forth above.

35. **INSURANCE.**

(a) Contractor shall, throughout the duration of this Agreement and for such additional time periods as required below, purchase and maintain, at its expense, and from time to time renew, such insurance as will protect the Contractor and the Indemnified Parties from claims which may arise out of or result from the operations under this Agreement and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a subcontractor or by anyone directly or indirectly employed by any of them, and to meet the following minimum requirements:

(i) Worker's Compensation Insurance in statutory amounts.

(ii) Employer's Liability Insurance in the minimum amount of $2,000,000.00.

(iii) Commercial General Liability Insurance on an occurrence form in the minimum amount of $2,000,000.00 per occurrence covering both Bodily Injury and Property Damage and $3,000,000.00 in the aggregate on a per project basis including coverage for premises operations, personal and advertising, independent contractors, products and completed operations and broad form contractual liability coverage for Contractor's indemnification as provided for in this Agreement; products and completed operations coverage shall be maintained for not less than three (3) years following completion of work.

(iv) Comprehensive Automobile Liability Insurance in the minimum amount of $1,000,000.00 combined single limit for Bodily Injury and Property Damage if automobiles are used in the performance of Contractor's obligations hereunder and including coverage for owned, non-owned and or hired vehicles.

(v) Non-occupational and Disability Insurance, if required by the State where the Property is located.

(vi) In the event that Contractor is to park motor vehicles as part of the Services herein, Garage Keepers Legal Liability Insurance in an amount of not less than $1,000,000, which insurance may be subject to a deductible provision not to exceed $250 per occurrence.

(vii) In the event Contractor is to operate a parking garage as part of the Services herein, Garage Liability Insurance in an amount of not less than $1,000,000 combined single limit.

(viii) Liquor Liability Insurance shall be maintained by any Contractor providing and or serving alcohol as part of the Services herein, with a limit of not less than $2,000,000.

(ix) Umbrella/Excess Liability Insurance in the minimum amount of $5,000,000 covering both Bodily Injury and Property Damage on a form that is not more restrictive than underlying and providing excess coverage to the Commercial General Liability, Auto Liability, Liquor Liability, Employers Liability and Garage Liability as applicable.

(x) Professional Liability / Errors and Omissions Insurance shall be maintained by any consultant or Contractor providing professional services. Such coverage shall be maintained at its own cost with limits of not less than $2,000,000 for each claim and $2,000,000 in the aggregate covering financial loss as well as bodily injury and property damage arising from errors and omissions committed in the performance of Professional Services. This insurance shall provide coverage for the Professional Services performed under this

Agreement by the consultant or Contractor or anyone directly or indirectly employed by it. Contingent bodily injury and property damage coverage shall not be subject to any sublimit. Such coverage may be provided on a "claims-made" policy form, provided the coverage effective date precedes the date upon which services begin and is maintained by renewal or extended reporting provision for not less than three (3) years after completion of services.

(xi) Contractors Pollution Liability Insurance shall be maintained by any Contractor providing services and or performing operations relating construction, renovation, environmental abatement, remediation or work involving use, treatment, storage, removal or transportation of hazardous materials at, to or from the property, with limits of liability not less than $5,000,000, covering all operations performed and including coverage for cleanup, bodily injury and property damage and having no mold exclusion. With respect to all contractors transporting and/or disposing of hazardous waste, such insurance must also include coverage for transportation and all owned and/or non- owned disposal sites to which waste is hauled, all on a primary and non-contributory basis and continuing for not less than two (2) years following completion of work and on terms otherwise satisfactory to Owner.

All such insurance shall be issued by Companies licensed to do business in the state where the Property is located, having a Best's rating of not less than A-VIII, and otherwise satisfactory to Owner. All of such policies (with the exception of professional liability insurance) shall be on an "occurrence basis" and the parties listed on Exhibit C attached hereto, and any and all other parties identified by Owner, from time to time, shall be named as additional insureds ("**Additional Insureds**") under Contractor's General Liability, Automobile Liability and Excess Liability insurance policies for the full term required including products and completed operations terms. Certificates of insurance in customary form, evidencing that premiums for the foregoing insurance have been paid, shall be delivered by Contractor to Manager simultaneously with Contractor's execution of this Agreement and prior to Contractor performing any Services hereunder. Within thirty (30) days prior to expiration of such insurance similar updated certificates of insurance shall be delivered by Contractor to Manager evidencing the renewal of such insurance, together with evidence satisfactory to Manager of the payment of the premium. All certificates of insurance must contain a definite provision that if the policies of insurance evidenced by such certificates are canceled or changed during the periods of coverage as stated therein, in such a manner as to effect the coverage afforded by such policies, written notice will be mailed to Manager and Owner by certified mail and return receipt requested at least thirty (30) days prior to such cancellation or change.

(b) Contractor shall procure an appropriate clause in, or endorsement on, each of its policies for fire or extended coverage insurance where applicable and be responsible to maintain property damage insurance covering the Contractor's personal property, materials or equipment whereby the insurer waives subrogation or consents to a waiver of the right of recovery against Manager and Owner, and having obtained such waiver of subrogation or waiver of the right of recovery, Contractor hereby agrees that it will not make any claim against or seek to recover from Manager or Owner for any loss or damage to property of the type covered by such insurance. Contractor and any of its subcontractors, agents and employees, also agree to waive all rights of recovery and subrogation against the Owner and manager and will have their insurance policies required to be maintained above provide waivers of subrogation by endorsement or otherwise.

(c) Contractor's Comprehensive General Liability Insurance shall be primary, and any such insurance maintained by Manager and/or Owner shall be secondary and non-contributory and excess over the Comprehensive General Liability Insurance to be maintained by Contractor hereunder.

(d) No deductibles maintained by Contractor shall be applied to Owner or Manager and shall be the full responsibility of the Contractor.

(e) In the event that the Contractor has in force any insurance coverage with coverages broader and/or limits higher than the minimum coverage amounts specified hereunder, (1) such broader terms and higher limits shall insure and be available to each of the Additional Insureds and (2) this Contract shall be deemed to require such broader terms and higher limits.

(f) Any insurance limits required by this Agreement are minimum limits only and are not intended to restrict the liability imposed on any Contractor for work performed under this Agreement.

(g) Contractor agrees that the provisions set forth in this Paragraph 35 shall be imposed upon, assumed and performed by each of its subcontractors, if any.

36. **PERSONAL PROPERTY**. All of the equipment, effects and property of every kind of Contractor, and all persons claiming, by, through or under Contractor, which may be at the Property, shall be at the sole risk and hazard of Contractor and if the whole or any part thereof shall be destroyed, damaged, or stolen, no part of said loss or damage is to be charged to or borne by Owner. Upon the expiration or earlier termination of this Agreement, Contractor shall remove all of its personal property from the Property.

37. **CONTINUANCE OF PERFORMANCE**. Unless ordered by a court of competent jurisdiction or otherwise agreed in writing between Contractor and the Owner, during all disputes, or actions, claims or other matters arising out of or relating to this Agreement or the breach thereof, provided Owner continues to pay undisputed amounts, Contractor shall perform the undisputed portion of the Services to be provided by Contractor hereunder.

38. **CONFIDENTIALITY OF OWNER'S RECORDS.**

(a) Contractor acknowledges that all information disclosed by Owner or Manager to Contractor for purposes of performing the Services, or which come to the attention of Contractor during the course of performing such Services, constitutes a valuable asset of and is proprietary to Owner and/or Manager. Contractor also acknowledges that Owner, as a party in the business community, may have fiduciary responsibilities to its tenants or customers to keep their records confidential and proprietary. Contractor shall not disclose said information or knowingly permit its employees, officers or agents to disclose said information, to any non-employee of Contractor or to any employee of Contractor not having a specific need-to-know in performing the Services authorized by Manager and Owner. All of the data, notes, estimates, computations, sketches, photographs, presentations, renderings, computer programs and all other materials relating to the Services are and shall remain, together with all copyright privileges, the property of Owner. Additionally, Contractor agrees that all designs, plans, reports, specifications, drawings, inventions, processes and other information or items produced by Contractor for purposes of performing the Services, will be assigned to Owner as the sole and exclusive property of Owner and Owner's assigns, nominees and successors. Contractor shall not record this Agreement or any notice or short form of this Agreement.

(b) Contractor further agrees to instruct its employees, officers and agents not to sell, lease, assign, transfer or reveal to any organization, company or individual any of said information whether oral or written, without the prior written consent of Owner, and agrees to take all reasonable steps necessary to ensure fulfillment of this obligation.

(c) In the event that a subpoena or other legal process is served upon Contractor that in any way concerns information disclosed by Owner or Manager to Contractor, Contractor agrees to notify Owner and Manager immediately upon receipt of such subpoena or other legal process and will cooperate with Manager and Owner, at Owner's

expense, in any lawful effort by Owner and/or Manager to contest the legal validity of such subpoena or other legal process. This Section 38 shall survive the termination of this Agreement.

39. **CONTROLLING LAW, JURISDICTION AND VENUE**. This Agreement and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by the laws of the state in which the Property is located, without application of conflicts of law principles. Any legal proceeding relating to this Agreement shall be brought and heard exclusively in the state courts located in county where the Property is located and the parties hereby irrevocably consent and submit to personal jurisdiction exclusively in said courts. No rights or remedies available to either party under this Agreement or by operation of law are waived or modified unless expressly waived or modified by that party in writing.

40. **EXECUTION IN COUNTERPARTS**. This Agreement may be executed in counterparts, each of which shall be deemed to be an original as against any party who signs the counterpart. All counterparts together shall constitute one instrument. This Agreement shall become binding when one or more counterparts, individually or together, bears the signatures of all of the parties reflected as the signatories. The parties acknowledge and agree that this Agreement may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature.

41. **INTERPRETATION.** Each party agrees to the use of the particular language of the provisions of this Agreement, and any questions of doubtful interpretation shall not be resolved by any rule or interpretation against the draftsman, but rather in accordance with the fair meaning thereof, having due regard to the benefits and rights intended to be conferred upon the parties and the limitations and restrictions upon such rights and benefits intended to be provided.

42. **MISCELLANEOUS.** Notwithstanding anything to the contrary in this Agreement:

(a) Contractor shall implement internal protocols for its personnel consistent with (x) the Center for Disease Control and Prevention's (CDC's) Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19), May 2020, and (y) any applicable state and local law, ordinance or regulation related to or in response to the COVID-19 pandemic, each as may be amended, from time to time (together, the "CDC COVID-19 Guidance").

(b) Until further notice from Owner, while on-site at the Property, Contractor's personnel shall wear (i) a face covering, (ii) any personal protective equipment recommended in the then current CDC COVID-19 Guidance, including but not limited to gloves, and (iii) any other personal protective equipment reasonably requested by Owner.

(c) Contractor shall perform a daily personal health screen of its personnel prior to the personnel entering the Property consistent with the protocols in the then current CDC COVID-19 Guidance. Any individual with a fever (over 100 degrees Fahrenheit) or who is experiencing other potential COVID-19 related symptoms, is living with or has been in close contact with anyone confirmed to be COVID positive or showing the symptoms of COVID, should not report to the Property until cleared to return to work pursuant to the protocols of the CDC COVID-19 Guidance.

(d) Contractor shall notify Owner immediately if any of Contractor's personnel performing Services at the Property tests positive for the COVID-19 virus and shall not permit the employee to return to the Property until CDC COVID-19 Guidance authorizes return.

(e) Contractor acknowledges and agrees that all of its employees, contractors, subcontractors, agents and all other persons performing the Services have been or will be properly trained on the use of personal protective equipment prior to entering the Building and/or performing the Services.

IN WITNESS WHEREOF, this Agreement is executed by the parties set forth below as of September 28th, 2023.

**Contractor:**

**American Anchor, Inc.**

By: SBrown
Print Name: Sandy Brown
Title: Inspections Coordinator
Hereunto Duly Authorized

**Owner:**

**100 Summer Owner LLC,**

By: Rockhill Management, L.L.C., as agent for Owner

By:
Print Name: Adam T. Leonard
Title: Property Manager

**EXHIBIT A**

**Description of Services**

See attached.

This proposal is for American Anchor, Inc. to inspect all fall protection equipment found on the roof to insure it is operating as originally designed and is safe for its intended use.

Scope of work: Inspect entire roof anchor rigging point system located at 100 Summer Street, including 53 single bolt-through roof anchors and 42 davit bases (tie-back only).

**EXHIBIT B**

**Contract Payment Terms**

[To be attached, if applicable]

One-year contract, price valid for 2023 inspection: [redacted] building

Payment Terms: Invoice will be delivered upon completion of each annual inspection. Payment is due upon receipt of invoice. Fees are for annual inspections only and any necessary repairs to equipment that may be discovered are not covered in this proposal.

AMERICAN ANCHOR

EXPERTS IN FALL PROTECTION

305 Constitution Drive, Suite A, Taunton, MA 02780 • 800-371-8221 • Fax: 508-543-9199 • www.american-anchor.com

September 27, 2023

Adam Leonard
100 Summer Owner LLC
c/o Rockhill Management LLC
100 Summer Street, 9th Floor
Boston, MA 02110

**2023 Annual Fall Protection Equipment Inspection Proposal**
**100 Summer Street**

Dear Adam:

This proposal is for American Anchor, Inc. to inspect all fall protection equipment found on the roof to insure it is operating as originally designed and is safe for its intended use.

American Anchor, Inc. will perform this inspection utilizing qualified technicians experienced and familiar with the fall protection industry and in particular the equipment to be inspected. The technician will be an employee of American Anchor, Inc. and a Licensed Professional Engineer experienced with this type of work has developed the inspection criteria. All inspections as required by Occupational Safety and Health Administration (OSHA) regulations and American National Standards Institute (ANSI) guidelines will be visual in nature with physical inspection limited to areas of concern regarding rust, tension of bolts, flashing, missing components, damaged equipment, and structural integrity.

American Anchor, Inc. reserves the right to tag components “OUT of SERVICE” if in the technicians’ opinion they are found to be unsafe for use until further investigation or repairs are performed.

Upon completion of the onsite inspection, American Anchor, Inc. will deliver within 10 business days a written report, including concerns or necessary repairs if required, and a Certificate for Use if all items are in full operational condition. This certificate will remain in full effect for one year from the inspection date and if American Anchor, Inc. performed the original install, all warranties on the anchor products will remain in effect for the same period.

Daily inspections by competent persons should be performed and logged during use and any problems with the anchors should be detailed and reported to a qualified individual immediately.

Scope of work: Inspect entire roof anchor rigging point system located at **100 Summer Street**, including 53 single bolt-through roof anchors and 42 davit bases (tie-back only).

**One-year contract, price valid for 2023 inspection: $[redacted]/building** ___________
Initial for acceptance

| Choose an extended contract for additional savings | Initial for Acceptance | Purchase Order Number (optional) |
|---|---|---|
| Three-Year Contract<br>[redacted] per year/per building<br>Valid for 2023-2025 | | |
| Five-Year Contract<br>[redacted] per year/per building<br>Valid for 2023-2027 | | |

Payment Terms: Invoice will be delivered upon completion of each annual inspection. Payment is due upon receipt of invoice. Fees are for annual inspections only and any necessary repairs to equipment that may be discovered are not covered in this proposal.

Your qualified technician and will contact you to schedule the inspection after American Anchor, Inc. receives your signed proposal.

Do not hesitate to contact me if you have questions. If you would like to proceed with this work, please sign this proposal and return it to me. Thank you for considering American Anchor, Inc. for this important safety project and we look forward to assisting you with all of your fall protection needs.

Work Safe, Stay Anchored.

Respectfully,

SBrown

Sandy Brown
Inspection Department
American Anchor, Inc.
sandyb@american-anchor.com
Cell: 801-520-5686

Acceptance of This Proposal
100 Summer Owner LLC
c/o Rockhill Management LLC

Signature:

Print Name:

Title:

Date:

Purchase Order #: (optional)

**EXHIBIT C**

**Additional Insureds**

100 Summer Owner LLC

Rockhill Management, L.L.C.

Rockpoint Real Estate Fund VI, LP

Rockpoint Real Estate Parallel Fund V AIV, LP

Rockpoint Real Estate Parallel Fund VI FR, LP

RP 100 Summer Member, LLC

100 Summer Holdings, LLC

PO Square Parking Owner, LLC

100 Summer Club LLC